[No. B020005. Second Dist., Div. Six. Mar. 8, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
TIM DALE MORRIS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to Rule 976.1 of the California Rules of Court this opinion is certified for partial publication. The portions of this opinion to be published follow.

COUNSEL

Corinne S. Shulman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Linda C. Johnson and Stephen M. Kaufman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GILBERT, J.—Defendant Tim Dale Morris appeals his judgment of conviction of murder, robbery and burglary. We affirm and hold that the prosecution established that electrophoretic multisystem testing of bloodstains is generally accepted by impartial scientists within the scientific community.

. . . . . . . . . . . . . . . . . . . .*

FACTS

During the evening of March 14, 1985, the Nye home, sited in rural Ventura County, was burglarized. William Nye, an elderly, deaf, one-legged

---

*See footnote *ante,* page 377.

man, was beaten to death as he lay in bed. Between 10 and 10:30 p.m. that evening, a neighbor noticed lights in the Nye house, an unusual occurrence during that time of evening. When Nye's cook arrived the following morning, she discovered Nye's body and the house furnishings in disorder. When she telephoned from the Nye residence for assistance, she noticed that the telephone receiver was greasy.

Sheriff's officers discovered a bloodstained and broken table leg, taken from the Nye stable, in the house and a fireplace poker a few yards from the house. A pathologist opined that Nye died of multiple blows to the head between 8 p.m. and 1 a.m. that evening and that his injuries could have been inflicted by a table leg and fireplace poker.

The intruder had broken a living room window from the outside to enter the house. A bloodstain lay on the concrete porch beneath the window. A sheriff's department criminalist collected and froze the bloodstain the day following the murder. Approximately 19 days later, she analyzed the bloodstain for ABO antigens and for certain polymorphic enzymes. She also analyzed the blood of the victim and the defendant and concluded that although the defendant, the victim and the bloodstain had type O blood, other genetic characteristics of the bloodstain matched those of the defendant, but not the victim. Two expert witnesses testified at trial that according to theories of compound statistical probability, 3.5 percent or 3.6 percent of the Caucasian population in Ventura County possessed these genetic characteristics.

Sheriff's officers noticed abundant shoeprints in the soft soil surrounding the Nye stable and leading from an adjacent river bed. A shoe impression also existed under the broken window and upon a kicked-in bedroom door. The prints bore a distinctive starburst heel and semicircular pattern with cross tread similar to high-top Mitre tennis shoes worn by defendant and seized by sheriff's officers during a search of defendant's residence. According to a Mitre shoe distributor, only one store in Ventura County sold these shoes. At trial four witnesses identified the shoes as belonging to the defendant. A sheriff's officer also testified that new size 12 Mitre high-top tennis shoes made shoeprints similar to those on the Nye premises.

A sheriff's department criminalist examined the Mitre tennis shoes and discovered three limb hairs in the left shoe tongue and five in the right shoe tongue. He testified that although limb hair has the least characteristics for comparison, six hairs were similar to the limb hair of defendant. Examination of remaining two hairs yielded inconclusive results.

Nye family members determined that the burglar had taken guns, jewelry, a calculator, a starting pistol, a fox fur and other personal items. Nye's

nephew described three missing guns: a .45-caliber pistol with a broken front barrel; a .22-caliber tube fed rifle with hand carving upon its stock and fireplace ashes in its barrel; and a .22-caliber single gauge shotgun. The jewelry included an antique diamond ring that belonged to Nye's former housekeeper. The fox fur was 50 years old and had belonged to Nye's mother.

Shortly before the murder, defendant resided with Sherrie Yates, in a house approximately 2.8 miles from the Nye house. Yates testified at trial that about "a week or two" prior to the murder, defendant admitted to her that "he'd like to hit [the Nye] house." She sought to dissuade defendant by informing him that Nye was "a crippled old man" who did not have possessions of value.

On the day of the murder, Yates, having been evicted from her residence, resided with her parents. At approximately 10:30 p.m. that evening, defendant telephoned her at her parents' home. Her father answered the telephone, recognized defendant's voice, and handed Yates the telephone. Defendant stated: "It's a life or death matter. I need you to come pick me up." When Yates protested the lateness of the hour, he threatened to kill her and her three-year-old daughter, stating that he "care[d] nothing about [her] family."

Yates agreed to meet defendant at the Casitas Market. When she arrived, she observed he was sweaty and his hair was wet. His hands were dirty and he had a bloody bandage upon one hand. Defendant directed her to drive upon a deadend road. When she stopped at the road's end, approximately two-tenths of a mile from the market, defendant left the car and retrieved a rolled up blanket and a backpack or pillowcase from the bushes. He placed these objects in the car and Yates drove to the residence from which she had been evicted. There, defendant gave her a jewelry box and a fox fur. She opened the jewelry box and discovered the diamond ring belonging to Nye's former housekeeper. Yates then unrolled the blanket roll and found a shotgun and rifle. Defendant also handed Yates a .45-caliber pistol from the waistband of his trousers. Upon his advice, Yates rubbed the guns with cooking oil to remove her fingerprints. Yates then returned to her parents' home and later bartered the pistol for drugs and cash.

Three days after the murder, Yates visited her boyfriend Craig Redford, who was in jail on a conviction for drunk driving. She displayed the diamond ring that defendant had given her. The following day she telephoned Redford and informed him that defendant had threatened her. Redford then spoke with defendant and told him he could not use his car for "robbing houses." Redford also threatened to "break [defendant] in half" if he

continued to threaten Yates. Defendant then admitted that he "was in a lot of trouble," and stated: " 'I guess you heard what happened to the old man on the back road.' " Defendant also stated that he desired to "get rid of" some property.

Near this time, Yates drove defendant (but not the guns and other purloined property) from her former house to the residence of Ellie "Grandma" Montgomery at 214 McKee Street in Ventura. Defendant hid the guns in bushes near the former house. During the trip, he "nervously" slouched in the car and explained that he "shouldn't be seen in this area."

Based upon information provided by Redford, Yates, and another informant, sheriff's officers obtained a search warrant for the Montgomery residence at 214 McKee Street. There officers found a pair of Mitre tennis shoes bundled in wet clothing in the laundry area of a covered patio. Mrs. Montgomery consented to a search of her car and in the trunk, officers discovered a shotgun and .22-caliber rifle, later identified by Nye family members as belonging to the Nye household. The day prior to the search, Mrs. Montgomery had lent her car to defendant and another boarder, Debbie Makules. Mrs. Montgomery testified that the trunk contained no guns when she lent them the car. A consensual search of the trunk of a car owned by Makules also disclosed the starting pistol and calculator belonging to Nye.

Defendant denied murdering Nye or being present during his death. He also denied wearing or owning the Mitre high-top tennis shoes. He explained his hand injury as a burn. He stated that he spent the evening of the murder at the Montgomery residence, recovering from flu and withdrawing from methedrine. He also testified that Yates admitted to him that she and her brother killed Nye and that she requested him to retrieve the guns from a house on Harrison Street.

In rebuttal, the sheriff's department criminalist testified that she tested and determined that Sherrie's brother, Adrian Yates, had type AB blood. Earlier the criminalist had testified that Sherrie Yates also had type AB blood.

The jury convicted defendant of murder, robbery and burglary but could not agree upon imposition of the death penalty. After the prosecution elected not to seek the death penalty, the trial judge sentenced defendant to life imprisonment without the possibility of parole for the first degree murder. He suspended execution of sentence upon the robbery and burglary counts under Penal Code section 654 but imposed an additional five-year enhancement for defendant's prior conviction of burglary. (Pen. Code, § 667.)

On appeal defendant argues that (1) the prosecution failed to establish that electrophoretic testing of dried bloodstains is generally accepted within the scientific community; (2) Evidence of genetic frequency is irrelevant and unduly prejudicial.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .*

DISCUSSION

I.

A.

Morris contends that the trial judge erred by admitting into evidence the electrophoretic analysis of the dried bloodstain on the Nye porch because the prosecution failed to establish that electrophoretic testing of bloodstains enjoys general acceptance in the scientific community under *Kelly/Frye* standards. (*Frye* v. *United States* (D.C.Cir. 1923) 293 Fed. 1013, 1014; *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240].) He also argues that the prosecution did not prove that *aged* bloodstains are validly and reliably tested or that this stain was validly and reliably preserved for analysis.

Only one published California decision has considered and decided whether electrophoretic analysis of dried fluids and stain samples is admissible under *Kelly/Frye* standards. *People* v. *Reilly* (1987) 196 Cal.App.3d 1127, 1131 [242 Cal.Rptr. 496] recently concluded that electrophoretic testing of dried bloodstains is generally accepted by the scientific community. Here we decide that based upon our review of the expert testimony in the trial court, the relevant scientific literature, *People* v. *Reilly, supra,* and the many decisions from other states admitting such evidence, electrophoretic testing of dried fluids and stain samples enjoys a consensus of support in the scientific community. We also decide that the prosecution established that this particular bloodstain was validly and reliably preserved for analysis.

B.

Criminalist Margaret Schaeffer testified that on the morning following Nye's murder, she collected a bloodstain from the concrete porch of the Nye residence. She described the blood stain as "completely round . . . approximately an inch across . . . bright red . . . very soluble in water [and] easily removed . . . ." She moistened a sterile cotton cloth with

---

* See footnote, *ante,* page 377.

distilled water and removed the stain onto the cloth. The cloth was then air-dried and frozen until she analyzed it approximately 19 days later. At the same time, Schaeffer also collected a control stain of an area close to the bloodstain but where no blood was visible. Her purpose was to assure that her analysis of the blood stain "[was] not due to something that was already present on the concrete front porch."

Schaeffer also obtained whole blood samples from the victim and defendant. She prepared a stained cotton cloth from each sample and electrophoretically analyzed each stain, using a multisystem analysis to test six blood enzymes or proteins in groups of three. She used controls as well as comparisons with published standards to interpret her results. Another criminalist in the laboratory also interpreted the results she received. She then photographed her test results and an independent forensic serologist, Edward Blake, reviewed the photographs at trial and agreed with Schaeffer's conclusions.

Schaeffer and other witnesses described electrophoresis as a process for separating blood protein molecules based upon their electrical charges. The procedure requires that a blood sample be posited on a gel medium in an ionized buffer solution. An electrical current passes through the solution and the sample separates and migrates onto the medium into patterns that can be fixed, dyed, and interpreted by an analyst. (Jonakait, *Will Blood Tell?* (1982) 31 Emory L.J. 833, 836-842; *People* v. *Brown* (1985) 40 Cal.3d 512, 529 [230 Cal.Rptr. 834, 726 P.2d 516], revd. on other grounds (1987) 479 U.S. 538 [93 L.Ed.2d 934; 107 S.Ct.837].) As the expert witnesses explained, the enzymes and proteins in blood are polymorphic; they display different molecular forms but the same biological function. The differing molecular forms of the numerous blood enzyme and protein systems make it unlikely that any two individuals, except identical twins, would possess identical enzyme and protein constitutions. (See Note, *The Admissibility of Electrophoretic Methods of Genetic Marker Bloodstain Typing Under the Frye Standard* (1986) 11 Okla. City U.L.Rev. 773, 776-777 (hereafter cited as *Admissibility of Electrophoretic Methods*).)

Both the bloodstain and defendant's blood exhibited identical types of these six proteins: erythrocyte acid phosphatase (EAP); adenosine deaminase (ADA); adenylate kinase (AK); esterase D (EsD); phosphoglucomutase (PGM) and its subtype; and glyoxalase I (GLO). The victim's blood differed as to the proteins EAP, AK, PGM and its subtype, and GLO. Of the six proteins tested, the blood of the victim and the defendant possessed identical types of two proteins—ADA and EsD.

## C.

There were five witnesses at the pretrial *Kelly/Frye* hearing, all of whom testified for the prosecution. Two witnesses were university professors, two were criminalists and one was a forensic serologist employed as a consultant in criminal cases. Based upon this expert testimony and a review of relevant scientific and legal literature, the trial judge decided that electrophoretic analysis of bloodstains was generally accepted within the scientific community as valid and reliable. He also determined that the particular procedures employed by criminalist Schaeffer in this case were generally accepted within the scientific community as valid and reliable.

Robert Sparks, M.D., a medical professor at the University of California at Los Angeles, testified at the *Kelly/Frye* hearing that he was the chief of medical genetics at the university medical school. Doctor Sparks described electrophoresis and the polymorphic proteins existing in blood and testified that a technician employing the electrophoretic methods described in certain handbooks would achieve correct results. He stated that if the procedure was executed incorrectly, the results would be obviously wrong. He also opined that electrophoretic testing to determine blood enzyme types was valid, reliable and generally accepted within the scientific community. Doctor Sparks tested whole blood in paternity studies but had no recent experience with bloodstains.

Jeffrey Morris, M.D., assistant professor of pathology at the University of California at Irvine and director of a Long Beach parentage testing laboratory, testified that electrophoretic multisystem testing was generally accepted within the scientific community both for paternity and criminalistic analyses. He based his opinion upon scientific literature and the discussions held at scientific gatherings that he attended. He also stated that the six proteins analyzed in this case were stable and could be "reproduceably typed off of dried blood . . . ." Although he worked generally with whole blood analysis, Morris testified that it was "common knowledge" that no differences existed between whole blood and stain testing by electrophoresis. At trial Morris stated that his laboratory analyzed bloodstains donated by newborns in testing for certain rare diseases.

Margaret Schaeffer, a criminalist in the Ventura County Sheriff's laboratory, possessed a bachelor of science degree in biology and zoology and had worked for nearly seven years as a forensic serologist. She had attended a two-week F.B.I. course in electrophoresis of bloodstains. Schaeffer was a member of the California Association of Criminalists and the American Academy of Forensic Science and had testified concerning isoenzyme analyses approximately 20 times. She opined that electrophoretic multisystem

testing for isoenzymes was generally accepted within the scientific community.

Arne Bergh possessed a doctor of science degree in biochemistry and had served as director of the Ventura County Sheriff's laboratory for five years. Formerly, he taught forensic science, including electrophoretic determination of isoenzymes, at Indiana University for four years. He opined that the scientific community generally accepted electrophoresis as a valid and reliable method of typing blood proteins.

Edward Blake possessed a doctorate degree in criminology and was a partner of Forensic Science Associates, a private physical evidence consulting laboratory in Emeryville. Blake's doctoral dissertation was entitled "Determination of Genetic Markers in Human Semen." He received two postgraduate grants to study the genetic analysis of dried biological evidence in sexual assault cases. At the *Kelly/Frye* hearing, Blake submitted a nine-page resume citing his membership in various professional societies and describing the papers that he had authored. He consulted on behalf of prosecuting agencies as well as defendants in criminal cases.

Blake opined that electrophoretic testing of dried blood proteins by the multisystem method was reliable and accepted within the scientific community of forensic serologists. He added that "the outcome of the experiment tells . . . in and of itself whether or not the procedure has been applied in a competent manner." Blake also stated that dried biological evidence could be preserved and thereafter analyzed: "[T]he best way to preserve biological evidence over the long run is to dry it and freeze it."

### D.

Under the *Kelly/Frye* rule, a new scientific technique must be " '. . . sufficiently established to have gained general acceptance in the particular field in which it belongs[,]' " in order to be admissible in evidence. (*People* v. *Kelly, supra,* 17 Cal.3d 24, 30.) The proponent of the evidence bears the burden of proving a consensus of opinion and must establish (1) the reliability of the method, usually by expert testimony; (2) the qualifications of the witness providing the testimony; and (3) that correct scientific procedures were used in the particular case. (*Ibid.*) The expert witness must possess academic and professional credentials that permit him to understand the scientific principles involved and any differing viewpoints regarding reliability. (*Id.* at pp. 37-40.) The witness must also be impartial—not so personally invested in establishing the technique's acceptance that he might not be objective about disagreements within the relevant scientific community. (*Ibid.*) Additionally, the trial court must exercise restraint and cautious

scrutiny of the general acceptance of the new process or technique when it is offered to identify the perpetrator of a crime. (*Id.* at p. 32.) The trial and the reviewing courts may examine the trial record, decisions from other jurisdictions and relevant scientific literature in deciding whether a technique is generally accepted. (*People* v. *Brown, supra,* 40 Cal.3d 512, 530.)

▮ Here Doctors Sparks, Blake and Morris testified that electrophoretic testing of blood proteins was generally accepted within the scientific community. Doctor Blake's opinion specifically concerned dried biological stains tested by the multisystem method. Although Doctors Sparks and Morris worked with whole blood analyses (except for Morris's bloodstain testing of newborns), that limitation upon their experience does not disqualify or necessarily diminish their expert opinions. Scientists who use electrophoresis and are capable of evaluating the reliability of electrophoresis of bloodstains may testify "if presented with the information they need to fill the gaps in their own knowledge and experience." (*People* v. *Young* (1986) 425 Mich. 470 [391 N.W.2d 270, 271].) Moreover, Doctor Morris possessed knowledge of multisystem analyses of dried biological fluids from his review of literature and attendance at scientific conferences and stated: "The scientific meetings that I attend in the field of dispute of paternity, about half the individuals do work in dispute of paternity and the other half work in the field of criminalistics and we have a joint meeting because techniques and analyses are so similar in the two areas."

The testimony also supported Schaeffer's procedures in this case. Doctor Sparks stated that a technician employing the methods described in certain laboratory handbooks would achieve correct results and that an incorrect procedure would produce obviously wrong results. Doctor Morris testified that the six blood proteins tested by multisystem analysis were stable in dried form and could be "reproduceably typed off of dried blood . . . ." Doctor Blake testified that dried biological evidence could be preserved by freezing and thereafter examined. Schaeffer stated that she collected and froze the bloodstain the morning following Nye's death and maintained its frozen state until analysis 19 days later. Doctor Blake also viewed the photographs Schaeffer took of the electrophoretic results and concurred in her analysis and conclusions.

### E.

Our Supreme Court in *People* v. *Brown, supra,* 40 Cal.3d 512, did not decide whether electrophoresis of dried biological fluids and stain samples was generally accepted within the scientific community but held that a *Kelly/Frye* foundation must be provided prior to admission of such evidence. The court noted that Doctor Benjamin Grunbaum, a biochemist and

a criminalist with a speciality in forensic identification, opposed electrophoresis of dried stains because the method was unreliable and because environmental conditions and contaminants could affect test results in varying degrees.[1] (*Id.* at pp. 530, 532.) The court also reviewed scientific literature indicating that aged or contaminated stains could disclose spurious or " 'false positive' " results. (*Id.* at p. 534.) Additionally, the court observed that the issue was one of "substantial legal controversy." (*Id.* at p. 532.)

*People* v. *Reilly, supra,* 196 Cal.App.3d 1127, recently considered testimony presented in light of *Brown* and concluded that electrophoretic testing of bloodstains is generally accepted by the scientific community. (P. 1131.) The court noted that Doctor Grunbaum, formerly a "lone detractor" to the reliability of the methodology, now admitted that electrophoretic typing of stains was reliable although he urged the adoption of quality assurance guidelines. (P. 1150.) Specifically, Doctor Grunbaum testified that a trained analyst could detect erroneous results caused by spoilation and degradation. Concerning aged stains, Doctor Grunbaum stated that often no result rather than a false result occurred. *Reilly* summarized testimony indicating that long term preservation of a stain could be accomplished by drying and freezing the sample for as long as five years. (P. 1145.)

Most jurisdictions examining the issue of electrophoresis of dried biological stains have admitted the test results into evidence. (See *Admissibility of Electrophoretic Methods, supra,* at p. 782.) These jurisdictions include South Dakota, Maine, Maryland, Georgia, Oklahoma, Kansas, Illinois, New Mexico and New York. (*Ibid.,* fn. 58.) In particular, two states that have adopted a *Frye* standard for new scientific techniques reviewed expert testimony and the relevant scientific literature and concluded that electrophoretic testing of dried stains was generally accepted within the scientific community.

---

[1] Two witnesses and one legal commentator have opposed admission into evidence of electrophoretic testing results of dried biological fluids. Doctor Benjamin Grunbaum participated in early development of the multisystem project, but withdrew in dissatisfaction with the multisystem. When the project was complete, Grunbaum claimed the results were falsified. An independent review panel found no basis for Grunbaum's charges, but the project sponsor decided not to publish the results. (*People* v. *Young, supra,* 391 N.W.2d 270, 275; *Admissibility of Electrophoretic Methods, supra,* pp. 791-792, chronicles the " 'starch wars' " conflict between Grunbaum and Brian Wraxall, his former colleague, concerning the appropriate gel medium for electrophoresis testing.) Doctor Diane Juricek, a genetic counselor, has no experience with bloodstain genetic marker detection and bases her criticism on her review of scientific literature. (*People* v. *Reilly, supra,* 196 Cal.App.3d 1151, fn. 7; *Admissibility of Electrophoretic Methods, supra,* pp. 793-794.) Professor Randolph Jonakait, an attorney but not a scientist, has published a law review article criticizing bloodstain typing results. (*People* v. *Reilly, supra,* 196 Cal.App.3d 1144, fn. 6; Jonakait, *Will Blood Tell?, supra,* 31 Emory L.J. 833.)

*State* v. *Washington* (1981) 229 Kan. 47 [622 P.2d 986] concerned the six blood proteins also analyzed here. *Washington* noted that the multisystem analysis was used by more than 100 criminal laboratories and by the F.B.I. research laboratory. (*Id.* at p. 992.) The court also found meritless the assertion of Doctor Benjamin Grunbaum, a defense witness, that the enzyme EAP degrades rapidly in dried stains. Instead, the court accepted the results of a study of the National Institute of Law Enforcement and Criminal Justice that concluded that EAP enzyme degradation did not commence until 13 weeks. (*Id.* at p. 990.)

Recently, *People* v. *Partee* (1987) 157 Ill.App.3d 231 [511 N.E.2d 1165, 1185], admitted the results of electrophoretic testing of dried bloodstains and noted that scientific opinion concluded that proper methodology and testing of the most stable blood proteins ensured that aging and environmental factors would not produce incorrect results. (Denault et al., *Detectability of Selected Genetic Markers in Dried Blood on Aging* (1980) 25 J. Forensic Sci. 479, 496; Sensabaugh, *Response to the Misapplication of Genetic Analysis in Forensic Science* (letter to the editor) (1984) 29 J. Forensic Sci. 12, 13; Sensabaugh, *Uses of Polymorphic Red Cell Enzymes in Forensic Science* (1981) 20 Clinics in Haematology 185; all cited in *Partee, supra,* pp. 1185-1186.)

Only one state has decided that electrophoretic analysis of bloodstains is not generally accepted within the scientific community. In *People* v. *Young, supra,* 391 N.W.2d 270, a majority of the Michigan Supreme Court concluded that a consensus in the scientific community concerning multisystem testing did not exist. The court emphasized that no "independently conducted reliability study" supported the thin-gel multisystem and that no comprehensive control tests had been conducted on different environmental or bacterial contaminants. (*Id.* at p. 272.)

The majority found persuasive the trial court testimony of Doctor Grunbaum that " '[t]here is just no way of knowing the degree of . . . the humidity, . . . heat . . . bacterial . . . [and], chemical contamination, and . . . this is a range that goes on beyond anyone's imagination.' " (*Id.* at p. 282; see *Admissibility of Electrophoretic Methods, supra,* pp. 793-803, criticizing the majority reasoning and suggesting that, in part, the majority determined which competing claim was correct rather than whether electrophoresis of bloodstains was generally accepted.) *People* v. *Reilly, supra,* 196 Cal.App.3d 1127, however, concluded from Doctor Grunbaum's testimony there that he "has shifted the focus of his attack since *Young*" and now admits that evidentiary bloodstains can be reliably typed. (*People* v. *Reilly, supra,* 196 Cal.App.3d at p. 1150.)

*People* v. *Partee, supra,* 511 N.E.2d 1165, 1185-1186, discussed scientific literature regarding the persistence of proteins and the effect of environmental and bacterial contaminants. *Partee* observed that the purported effects of environmental and bacterial contaminants have been investigated. (Denault et al., *Detectability of Selected Genetic Markers in Dried Blood on Aging, supra,* 25 J. Forensic Sci. 479, 496; see studies cited in *People* v. *Young, supra,* 391 N.W.2d 270, 293 (dis. opn. of Boyle, J.) and *Admissibility of Electrophoretic Methods, supra,* pp. 786-787, fns. 72, 76, 77.) The literature establishes that blood proteins that experience alteration while aging or drying are rejected for forensic use. (Sensabaugh, *Response to the Misapplication of Genetic Analysis in Forensic Science, supra* (letter to the editor) 29 J. Forensic Sci. 12, 13, cited in *People* v. *Partee, supra,* pp. 1185-1186.)

Our review of judicial decisions and relevant scientific literature persuades us that the scientific community is aware of and has met the concerns of aging and environmental and bacterial contamination. We cite the conclusion of a panel of scientists convened to examine the reliability of genetic marker bloodstain typing: " 'The existing . . . procedures for the determination and typing of blood group, isoenzyme, and polymorphic serum protein genetic markers in blood and body fluid stains are completely reliable. The procedures have been subjected to extensive scientific testing in hundreds of laboratories in the United States, Canada, Europe, Asia, Australia, and Africa by hundreds of forensic serological, immunological, and biochemical scientific specialists over the course of many years. There is widespread agreement in the relevant scientific community that reliable, accurate determination of genetic marker . . . types in dried blood and body fluid stains is possible using these techniques and procedures; and the techniques and procedures are currently in use in hundreds of forensic science laboratories throughout the world as well as throughout the United States.' " (Rep. of Am. Academy of Forensic Sciences, Ad Hoc Com. on Genetic Marker Typing 1 (Mar. 23, 1984), cited in *Admissibility of Electrophoretic Methods, supra,* pp. 803-804, fn. 211.)

Morris argues that forensic laboratories suffer from error rates between 1 percent and 17 percent and that this factor affects the reliability of their test results. Although it is true that Doctor Blake confirmed that the proficiency testing program of the Forensic Sciences Foundation reported this varying error rate, he explained that this included clerical errors and that chemical analysis errors were the least frequent type of error. We note that Professor George Sensabaugh has commented that for the commonly used genetic markers, the typing error rate is less than 1 percent. (Sensabaugh, *Response to the Misapplication of Genetic Analysis in Forensic Science, supra* (letter to the editor) 29 J. Forensic Sci. 12, 13, cited in *People* v. *Partee, supra,* 511 N.E.2d at pp. 1185-1186.)

## II.

▮ Defendant argues that reliability of electrophoretic testing aside, it was error to permit testimony that only a relatively small percentage of the population (3.5 percent or 3.6 percent of Ventura County according to expert witnesses) could have deposited the bloodstain. He contends that testimony regarding genetic frequency is irrelevant because it offers no guidance concerning which donor matching these genetic markers could have committed the crime. (*People* v. *Collins* (1968) 68 Cal.2d 319, 329-330 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].) He also points out that admission of statistical testimony suggests a mathematical probability of guilt that misleads the jury. (*Ibid.*) We disagree.

As our Supreme Court acknowledged in dictum in *People* v. *Brown, supra,* 40 Cal.3d 512, 536, footnote 6, both California and a majority of jurisdictions admit statistical blood-group evidence in criminal cases, even where it simply includes the accused within the class of possible donors, however large. (*People* v. *Lindsey* (1978) 84 Cal.App.3d 851, 863-866 [149 Cal.Rptr. 47, 2 A.L.R.4th 485] [defendant as well as 36 percent of population secrete type "O" antigens into body fluids]; *People* v. *Vallez* (1978) 80 Cal.App.3d 46, 56 [143 Cal.Rptr. 914] [defendant and 40 percent of population have type "A" blood].) Such evidence is as relevant as the fact that an accused was near the scene of the crime, for example. (*Lindsey, supra,* at p. 864.) Moreover, here other evidence existed linking defendant to the crime, and the judge instructed the jury that the bloodstain evidence was insufficient alone to establish guilt.

. . . . . . . . . . . . . . . . . .*

Accordingly, the judgment is affirmed.

Stone (S. J.), P. J., and Abbe, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 26, 1988.

---

* See footnote *ante,* page 377.