550 A.2d 561

**COMMONWEALTH of Pennsylvania**

v.

**Wade MIDDLETON, Appellant.**

Superior Court of Pennsylvania.

Argued June 7, 1988.

Filed Nov. 10, 1988.

504

Thomas J. Turner, III, Philadelphia, for appellant.

Peter Ainsworth, Assistant District Attorney, Philadelphia, for Com., appellee.

Before McEWEN, OLSZEWSKI and CERCONE, JJ.

McEWEN, Judge:

We here consider an appeal from the judgment of sentence imposed by the distinguished Judge David N. Savitt following a finding by the jury that appellant was guilty of first degree murder and robbery. The jury was subsequently unable to agree upon the sentence for murder and, as a result, the trial court removed the matter from the jury, and following the denial of post-verdict motions, sentenced appellant to serve a term of life imprisonment for

murder, and a consecutive term of imprisonment of from eight years to sixteen years for robbery.

In the early morning hours of December 20, 1984, an assailant knocked Nancy Bolden to the ground after she apparently resisted an attempt to take her purse. The assailant then dragged her into an alley, stripped her of most of her clothing, and brutally beat her, before leaving her partially clothed body covered by a trash bag. Approximately three hours later, appellant Middleton was arrested ·for the robbery of Ethel Henry approximately four to six blocks away from the area where the assault on Nancy Bolden had occurred. Ms. Bolden died some three months later from the injuries inflicted by her assailant, and approximately fifteen months later, appellant was arrested and charged with her murder.

 Middleton first alleges that the trial court erred in denying his motion to dismiss due to prearrest delay. He argues that the Commonwealth intentionally, unreasonably or recklessly delayed his arrest and that he was harmed by the lengthy delay between the date of the crime and his arrest. Specifically, he claims he suffered a loss of memory, rendering him unable to effectively present his testimony and the testimony of others in support of his alibi defense. *See Commonwealth v. Berry,* 355 Pa.Super. 243, 513 A.2d 410 (1986). Furthermore, he contends that the Commonwealth was, within six months of the date of the crime, in possession of all the evidence used at trial.

The Commonwealth maintains that an investigatory delay, if reasonable, does not violate due process, even if a defendant is actually prejudiced in the preparation of his defense as a result of the delay. *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). The Commonwealth argues that Middleton failed to substantiate his claim that the prearrest delay prejudiced him in his defense. The prosecution relies for this argument upon the testimony of appellant himself at the pre-trial hearing of May 18, 1987, a hearing held some two years after the death of the

victim and almost ten months after the arrest of appellant. Appellant, at the pre-trial hearing, testified in detail as to his activities during the afternoon of December 19, and the early morning of December 20, when the victim was beaten and robbed. The Commonwealth also argues that the arrest of appellant some fifteen months after the death of Ms. Bolden could not have been unexpected by appellant since at the time of his arrest for the robbery of Mrs. Henry, appellant was informed by the police that he was a suspect in another crime, his clothes were taken for analysis, and patches of his hair were secured for tests. Further, within three months of Ms. Bolden's death, appellant was interrogated by the police about the crime and even underwent lie detector tests, at which time he definitely became aware he was a suspect in the instant murder. While the actual arrest was delayed a further twelve months, appellant was, nonetheless, pursuing his defense since, he testified, his sisters undertook efforts to locate the two young ladies and the bartender in the club where he asserted he had been drinking when the instant murder took place.

The Commonwealth asserts that it conclusively established that any delay prior to Middleton's arrest was a necessary result of a careful and thorough investigation. *Commonwealth v. Crawford*, 468 Pa. 565, 364 A.2d 660 (1976) (defendant not denied due process despite four year prearrest delay because police encountered difficulty in putting together the case and because defendant was on notice that he was a suspect). The detective in charge of the investigation of Ms. Bolden's death testified (1) that numerous pieces of evidence had to be sent to the FBI crime laboratories for analysis, (2) that interviews with potential witnesses had to be conducted, and (3) that the only eyewitness to the crime could not be located for several months.

Appellant urges that the trial court abused its discretion in finding reasonable investigatory delay because the Commonwealth's explanation for the delay was contradictory. However, the conclusion of the trial court that the delay

was reasonable is a determination which is within the discretion of the trial court, whose decision may not be reversed unless there is insufficient evidence in the record to support the court's determination. Our review of the record reveals an ample evidentiary basis to support the trial court's finding that the delay was reasonable. Therefore, this argument is rejected.

■ Appellant also contends that the admission of evidence of the attack on Ms. Henry constituted reversible error because the circumstances of that robbery were not so similar to the instant case as to identify them both as the product of a "common scheme." The trial court, however, found that the evidence of the attack upon Ms. Henry was relevant and admissible on the issue of identification based upon the following similarities between the two crimes: (1) the attacks occurred within three hours of each other; (2) near alleyways which were only six blocks apart; (3) both victims were women, (4) walking alone, and (5) while Ms. Henry was elderly, Ms. Bolden appeared to be elderly; (6) both victims were called "bitch" by the attacker; (7) an eyewitness to the attack upon Ms. Bolden identified the black coat found near the scene of the attack upon Ms. Henry as the same or similar to the one worn by the perpetrator of the attack upon Ms. Bolden; (8) both the black coat and Ms. Bolden's body, when discovered, were covered with excrement, as was appellant when he was arrested, during the attack upon Ms. Henry, three hours after the attack upon Ms. Bolden; during the attack upon Ms. Henry; and (9) when arrested as a result of the attack upon Ms. Henry, appellant had in his possession articles belonging to Ms. Bolden.

Our Supreme Court, in *Commonwealth v. Brown*, 489 Pa. 285, 414 A.2d 70 (1980), specifically addressed the issue we here confront, namely, admissibility of evidence of another crime in a factual setting quite resemblant of the instant appeal:

On April 2, 1976, appellant, Stanley Brown, and his accomplice, Harvey Tabron, agreed to obtain money by

robbing an insurance agent working in the neighborhood. Appellant armed himself with a manriki (a two and one half foot chain used as a weapon in the martial arts) and Tabron was armed with a .22 caliber handgun. At approximately 12 noon, John Gallen, an employee of the Department of Housing and Urban Development, was inspecting houses in the 2800 block of Bonsall Street in the City of Philadelphia. Laboring under the mistaken belief that Mr. Gallen was an insurance agent, appellant and Tabron approached him and demanded money. They took from him a camera, two boxes of film, pictures, $16.00 in currency and a wristwatch. They then proceeded to West Sergeant Street.

At approximately 1 p.m. on the same day, the decedent, Carmen Falanga, an insurance agent, was collecting debits in the 2400 block of West Sergeant Street. As Mr. Falanga was entering his automobile, appellant grabbed him by the neck with the manriki and pushed him towards Tabron who had a gun drawn. The decedent began to struggle with appellant and drew a gun. The victim fired a shot at Tabron whereupon Tabron returned the fire, striking and killing the decedent.

Appellant complains that the testimony relating to the robbery of John Gallen was improperly introduced at his trial. He argues that this testimony was not only irrelevant but also highly prejudicial.

" 'It is a fundamental precept of the common law that the prosecution may not introduce evidence of the defendant's prior criminal conduct as substantive evidence of his guilt of the present charge. It has been succinctly stated that the purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more likely to commit the crime for which he is being tried. The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty,

and thus effectually to strip him of the presumption of innocence' ..."

*Commonwealth v. Spruill,* 480 Pa. 601, 606, 391 A.2d 1048, 1049–50 (1978) *quoting Commonwealth v. Terry,* 462 Pa. 595, 599–600, 342 A.2d 92, 94–95 (1975). *See also Commonwealth v. Clark,* 453 Pa. 449, 309 A.2d 589 (1973).

However, where the evidence is relevant, the mere fact that testimony of another crime may be prejudicial will not prevent its introduction into evidence. *Commonwealth v. Lasch,* 464 Pa. 573, 347 A.2d 690 (1975). Thus, evidence of other crimes has been admitted where that evidence tends to prove motive or intent, *Commonwealth v. Terry,* 462 Pa. 595, 600, 342 A.2d 92 (1975), absence of mistake or accident, *Commonwealth v. Peterson,* 453 Pa. 187, 197–8, 307 A.2d 264, 269 (1973), common scheme, plan or design (embracing commission of two or more crimes so related to each other that proof of one tends to prove the others), *Commonwealth v. Wable,* 382 Pa. 80, 82, 114 A.2d 334, 336–337 (1955), and to establish the identity of the person charged with the commission of the crime on trial, *Commonwealth v. Rose,* 483 Pa. 382, 399, 396 A.2d 1221, 1230 (1979). Although it is the prejudicial nature of this evidence that prevents it from being harmless error, *Commonwealth v. Spruill, supra* ["evidence of prior criminal activity ... is probably only equalled by a confession in its prejudicial impact upon a jury," 480 Pa. at 606, 391 A.2d at 1050–51], when introduced in a trial, its relevancy to the proceeding in question determines its competency.

In the instant case, the relevancy of the robbery of John Gallen was readily apparent. *The two crimes were committed within a period of approximately one hour and within a few blocks of each other.* The appellant was armed in both instances with the same relatively unique weapon. *In both instances, the manner of the attacks upon the respective victims was similar. The proceeds of the earlier robbery, i.e., the camera, was found at the scene of the crime in question.* Finally, the same indi-

viduals participated in both crimes and both instances resulted from the same criminal design. Under these facts, a challenge to the relevancy of the testimony relating to the initial robbery is obviously without substance. Here, there were several "legitimate [bases] for the introduction of the evidence other than a mere attempt to establish the accused's predisposition to commit the crime charged." *Commonwealth v. Spruill,* 480 Pa. at 606, 391 A.2d at 1050.

*Commonwealth v. Brown, supra* 489 Pa. at 294–298, 414 A.2d at 75–76 (emphasis supplied). Application of the criteria of *Brown* compels the conclusion that the learned Judge David N. Savitt properly ruled that evidence of the attack upon Ms. Henry was admissible.[1] This assertion of error is, therefore, rejected.

Appellant further argues that the trial court committed reversible error when it permitted, over objection, expert testimony concerning the results of an electrophoresis test upon dried blood stains in the present case because the Commonwealth presented only one witness to show the scientific reliability and acceptability of the electrophoresis when applied to dried blood stains.

This argument arises from a presentation by the prosecution of a serologist who testified that based on published scientific studies on electrophoresis of dried bloodstains and on his own experience in the field, electrophoresis of dried bloodstains is generally accepted as reliable among experts in the field of forensic serology. The expert further opined that crime scene contaminants do not degrade dried blood nor deteriorate genetic markers.

The Pennsylvania Supreme Court in *Commonwealth v. Topa,* 471 Pa. 223, 230, 369 A.2d 1277, 1281 (1977) established the standards by which scientifically adduced evidence may be qualified for presentation at trial in this Commonwealth when it adopted the notions so vividly ex-

---

1. It should be noted that the trial court also issued cautionary instructions to the jury regarding the use of this evidence.

pressed in *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (D.C.1923):

Just when a scientific principle or discovery crosses that line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*

*Commonwealth v. Topa, supra* 471 Pa. at 230, 369 A.2d at 1281, *quoting Frye v. United States, supra* at 47, 293 F. at 1014 (emphasis in original).

Our Supreme Court proceeded in *Commonwealth v. Topa, supra,* to pronounce the rationale for its adoption of the *Frye* standard:

"The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential."

*Commonwealth v. Topa, supra,* 471 Pa. at 232, 369 A.2d at 1282, quoting *United States v. Addison,* 498 F.2d 741, 744 (D.C.Cir.1974). *See also: Commonwealth v. Nazarovitch,* 496 Pa. 97, 100–103, 436 A.2d 170, 172–173 (1981).

■ This argument of appellant, though presented in most fervent fashion, is not persuasive since we conclude

that the Commonwealth did meet its burden under *Frye* through the expert testimony of a single expert "possess[ing] academic and professional credentials that permit him to understand the scientific principles involved and any differing viewpoints regarding reliability.... [and who is] impartial—not so personally invested in establishing the technique's acceptance that he might not be objective about disagreements within the relevant scientific community." *People v. Morris,* 199 Cal.App.3d 377, 245 Cal.Rptr. 52, 57 (1988) (citations omitted). An expert's opinion, alone:

> will not suffice to permit the introduction of such specific evidence into a court of law. Admissibility of the evidence depends upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs. "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."*

*Commonwealth v. Topa, supra* 471 Pa. at 230, 369 A.2d at 1281 *quoting Frye v. United States, supra* at 230, 293 F. at 1014 (emphasis supplied). Thus, if, as here, the expert witness's opinion is not merely based upon his personal views, or the views of a small segment of the scientific community, but rather, is to the effect that the scientific procedure has gained general acceptance in the scientific community as a whole due to its reliability, as evidenced by published scientific studies, then the testimony of a single expert is not deficient merely because *numerous* experts were not called to testify.

■ A study of the record and reflection upon the prevailing principles applicable to such scientific testimony com-

pels the conclusion that the trial judge correctly ruled the expert testimony admissible. First, the extended interrogation of the Commonwealth's expert established that electrophoretic analysis of dried blood has "gained general acceptance" in the national community of forensic serologists.

Second, appellate courts throughout the country have found electrophoretic testing of dried blood samples to be admissible under the standards enunciated in *Frye v. United States, supra,* namely: Illinois (*People v. Partee,* 157 Ill.App.3d 231, 110 Ill.Dec. 845, 865, 511 N.E.2d 1165, 1185 (1987)); Virginia (*O'Dell v. Commonwealth,* 234 Va. 672, 364 S.E.2d 491, 504–505 (1988)); California (*People v. Morris,* 199 Cal.App.3d 377, 245 Cal.Rptr. 52, 57 (1988)); Kansas (*State v. Washington,* 229 Kansas 47, 622 P.2d 986 (1981)); Maryland (*Smith v. State,* 62 Md.App. 627, 490 A.2d 1307 (1985)); Maine (*State v. Rolls,* 389 A.2d 824 (1978)); New Mexico (*State v. Chavez,* 100 N.M. 730, 676 P.2d 257 (1983)); and Georgia (*Graham v. State,* 168 Ga.App. 23, 308 S.E.2d 413 (1983)). *See also:* Note, *The Admissibility of Electrophoretic Methods of Genetic Marker Bloodstain Typing Under the Frye Standard,* 11 Oklahoma City Law.Rev. 773 (1986); Sensabaugh, G.F., "Uses of Polymorphic Red Cell Enzymes in Forensic Science," 10 Clinics in Hematology 185 (1981).

Moreover, the controversy over the use of dried blood stains rather than fresh blood samples projected by appellant as the basis for his argument would instead appear to be a concern which was addressed and resolved as the test in question advanced from the experimental to the demonstrable stage:

Electrophoresis has long been recognized as a reliable method of studying genetically determined differences between individuals and population. Thus, the methodology and genetic mark typing poses no issue of reliability or acceptance amongst the scientific community. Rather, the sole dispute centers on the use of electrophoresis by forensic scientists in examining genetic markers

from dry stain analysis and the effect of environmental factors on typing results. Juricek, D., "Misapplication of Genetic Analysis in Forensic Science." 29 J. Forensic Sci. 8 (1984)....

These concerns, however, have been recognized by forensic scientists evaluating the results of electrophoresis on dried blood stains (Denault, G.C., Takimoto, H.H., Kwan, Q.Y., and Pallos, A., "Detectability of Selected Genetic Markers in Dried Blood on Aging," 25 J. Forensic Sci. 479, 496 (1980)), and evaluation of these variables are considered by forensic scientists in detecting genetic markers. (Sensabaugh, G.F., "Response to the Misapplication of Genetic Analysis in Forensic Science", 29 J. Forensic Sci. 12 (1984)....

*People v. Partee, supra,* 110 Ill.Dec. at 865, 511 N.E.2d at 1185.[2]

And, finally, the appellant failed to introduce any evidence whatsoever tending to show unreliability or insufficient acceptance of the technique in the general scientific community. Therefore, the trial judge properly ruled that evidence of the test results was admissible.

Judgment of sentence affirmed.

**2.** *See also: People v. Morris, supra,* 245 Cal.Rptr. at 59:
Our review of judicial decisions and relevant scientific literature persuades us that the scientific community is aware of and has met the concerns of aging and environmental and bacterial contamination. We cite the conclusion of a panel of scientists convened to examine the reliability of genetic marker bloodstain typing: "The existing ... procedures for the determination and typing of blood group, *isoenzyme, and polymorphic serus protein* genetic markers in blood and body fluid stains are completely reliable. The procedures have been subjected to extensive scientific testing in hundreds of laboratories in the United States, Canada, Europe, Asia, Australia, and Africa by hundreds of forensic serological, immunological, and biochemical scientific specialists over the course of many years. There is widespread agreement in the relevant scientific community that reliable, accurate determination of genetic marker ... types in dried blood and body fluid stains is possible using these techniques and procedures...."
*Id.* at 59, *quoting* Report of the American Academy of Forensic Sciences, *Ad Hoc* Committee on Genetic Marker Typing (March 23, 1984).