[No. A039023. First Dist., Div. Four. Sept. 27, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK S. SMITH, JR., Defendant and Appellant.

[No. A046234. First Dist., Div. Four. Sept. 27, 1989.]

In re FRANK S. SMITH, JR., on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication with the exception of parts I., II.A., II.B.4., and II.C.-E.

**COUNSEL**

Tim Brosnan, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Stan M. Helfman, Laurence K. Sullivan and Blair W. Hoffman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CHANNELL, J.—By information, appellant Frank S. Smith, Jr., was charged with (1) robbery of an inhabited dwelling house (Pen. Code, § 211, former § 213.5);[1] (2) burglary of an inhabited dwelling house (§ 459); and (3) assault with a deadly weapon (§ 245, subd. (a)(1)). Enhancements relating to personal use of a deadly and dangerous weapon and the intentional infliction of great bodily injury were alleged as to each count. (§§ 12022, subd. (b), 12022.7, 1203.075, 1192.7, subd. (c)(23).) Five prior serious felony convictions or prior prison terms were also alleged. (§§ 667, 667.5, subd. (b).) Following a jury trial, appellant was found guilty of each count, and the enhancement allegations were found to be true. The court thereafter found each of the alleged priors to be true. Appellant was sentenced to state prison for a total of 26 years and 4 months.

I.*

. . . . . . . . . . . . . . . . . . . . .

II. DISCUSSION

A.*

. . . . . . . . . . . . . . . . . . . . .

B. *Evidentiary Issues*

1. *Introduction*

Appellant makes a lengthy, multi-pronged attack on the admissibility of an expert's electrophoretic analysis of dried bloodstains found on his shoes, sweat jacket, and some paper towels when compared with the blood of appellant and the victim. First, he contends that the trial court erred in refusing to hold a "full blown *Kelly/Frye* hearing" to determine whether the evidence of the results of electrophoresis testing of dried bloodstains would be admissible at trial. (See *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014.) Second, he argues that the trial court erred in admitting the prosecution's bloodstain analysis evidence against him. Finally, he

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.
* See footnote, *ante,* page 19.

contends that the trial court erred in allowing testimony regarding the statistical significance of the genetic marker analysis.

### 2. *Failure to Hold New Kelly/Frye Hearing*

In *People* v. *Kelly, supra,* 17 Cal.3d 24, it was held that the admissibility of expert testimony based upon the application of a new scientific technique involves a two-step process: "(1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. [Citations.] Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case. [Citations.]" (*Id.,* at p. 30.) Reliability for this purpose means that the technique " 'must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.*' " (*Ibid.,* quoting *Frye* v. *United States, supra,* 293 Fed. 1013, 1014, italics in original.)

The instant case was tried in April and May 1987. In December 1985, the California Supreme Court had held that evidence similar to that offered in this case was inadmissible absent a *Kelly/Frye* hearing in the trial court demonstrating the scientific acceptance of the tests performed. (*People* v. *Brown* (1985) 40 Cal.3d 512, 528-535 [220 Cal.Rptr. 637, 709 P.2d 440].) The Supreme Court was careful to limit its holding, however, noting that it could not determine from the information available to it at the appellate level whether there was a consensus in the scientific community as to the reliability of the relatively recent developments involving electrophoretic typing of human fluid stains. (*Id.,* at p. 534.) The court did not suggest that such a consensus was lacking: "We simply conclude that the answer must abide an adequate future trial record made with the help of live witnesses qualified in the applicable scientific disciplines. We therefore do not foreclose future attempts to admit stain-typing evidence based on a foundation such as we have described. [Citation and footnote omitted.] In this case, such a record not having been made, the evidence should not have been admitted." (*Id.,* at pp. 534-535.)

Meanwhile, there had already been held in Alameda County an evidentiary hearing of the type described by the Supreme Court. After an extensive pretrial hearing in September 1985 spanning eight days of testimony, the trial court in People v. Reilly (Super. Ct. Alameda County, 1985, No. 66342) ruled that electrophoretic typing of dried bloodstain evidence had found the general acceptance or consensus required under *Kelly/Frye*. (See *People* v. *Reilly* (1987) 196 Cal.App.3d 1127, 1135-1136, 1140-1148 [242 Cal.Rptr. 496] [affg. trial court].)

Before trial in our case, the prosecution proposed that the trial court take judicial notice of the transcripts and findings of three *Kelly/Frye* hearings concerning electrophoretic testing of dried bloodstains that had previously been held in Alameda County, including the transcripts from the evidentiary hearing held in *Reilly*. In addition to asking the court to judicially notice the Alameda County Superior Court records in the earlier cases, the prosecutor cited appellate decisions from Kansas, Maryland, Oklahoma, and New York which had held such evidence admissible, as well as a Michigan Supreme Court decision which had held to the contrary. Appellant objected, requesting a "full blown *Kelly/Frye* hearing" to determine whether blood analysis by electrophoresis, in general, and techniques of "multi-system" analysis, in particular, were generally accepted as reliable in the scientific community. The court indicated it was inclined toward taking judicial notice of the findings of the other judges within his own court as well as appellate opinions from other states, but that it would first give each side the opportunity to make an offer of proof as to why judicial notice should not be taken or to otherwise present additional evidence. The prosecutor stated that the criminalist, Alan Keel, had used the same methodology as used in at least one of the other cases as to which judicial notice would be taken, and offered to make Keel available to testify out of the presence of the jury prior to his actual trial testimony. Appellant did not take up that offer.

After hearing arguments from the prosecutor, appellant, and appellant's advice counsel, the trial court concluded that appellant had offered no proof of new evidence that would challenge the propriety of the earlier findings and stated that a complete *Kelly/Frye* hearing would only waste the court's time.[3] The trial court concluded that it would take judicial notice of the

---

[3] In so ruling, the trial court stated, in pertinent part: "The question here is plain and simple, as I understand it, that is, there is sufficient recognition through the vehicle of judicial notice, that I became aware of, for me to rule that a *Kelly/Frye* full blown hearing would be a waste of the court's time, because the electrophoresis testing has been found to be scientific to the point where it passes the test. And the issue before me at this point is plainly and simply this, I do not want in any way to deprive Mr. Smith of a hearing on information that may be useful in making my decision, that is to say, at this point, I am satisfied in my own mind, having reviewed the information before me, that judicial notice would suggest that this testing process is reliable, sufficient to present to the trier of fact, and any variation would be evidentiary and not a question of law.

"I invited observations as to what, if any, new information would be presented to me, should any expert whom the defendant wishes to call come before this court and advise me. . . .

"Mr. Smith seems to, at this point, be more dissatisfied with the findings that have been made by Judge Byers or Judge Travis and by Judge Bancroft than he is able to show, even by a scintilla of evidence, through proffered offer of proof, that there would be any new scientific data or any new criteria, that would challenge the credibility, the wisdom, [or] propriety of the prior findings. At this point, Mr. Smith, through his argument to me, and his advice counsel, through his report to me, has not satisfied me that this state of affairs exists.

findings of the trial judges in *Reilly* and the other Alameda County cases and the appellate decisions from other states cited by the prosecutor.

■ Contrary to appellant's assertions, we conclude it was appropriate for the trial court to take judicial notice of the earlier proceedings from within the same trial court. Evidence Code section 452, subdivision (d)(1) provides that judicial notice may be taken of the records of any court of this state. In accord with Evidence Code section 453, the prosecutor gave appellant advance notice of its requests for the court to take judicial notice of the other *Kelly/Frye* hearings and furnished the court with the transcripts necessary to enable it to take judicial notice as requested. Under these circumstances, the statute prescribes that the trial court *shall* take judicial notice of the matters specified. (Evid. Code, § 453.)

■ Further, the "preliminary showing of general acceptance of the new technique in the relevant scientific community" (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30) has been described as "a mixed question of law and fact." (*People* v. *Reilly, supra,* 196 Cal.App.3d at p. 1134.) As such, our Supreme Court contemplates that the deciding court may not only rely on "qualified experts" on the issue of scientific acceptance, but that it may also examine California precedent, cases from other jurisdictions, and scientific literature to ascertain whether a particular technique is generally accepted. *(People* v. *Brown, supra,* 40 Cal.3d at p. 530.) ■ In that context, so long as a defendant is not foreclosed from showing new information which may question the continuing reliability of the test in question or to show a change in the consensus within the scientific community concerning the scientific technique, we do not think it was inappropriate for a trial court to take judicial notice of earlier *Kelly/Frye* hearings held within the same court. (See *United States* v. *Bell* (E.D.N.Y. 1971) 335 F.Supp. 797, 800, fn. 2 [trial court takes judicial notice of proceedings in same district concerning scientific reliability of magnetometer]; cf. McCormick, Evidence (3d ed. 1984) Judicial Notice, § 330, p. 927.)

"It may well be that Mr. Smith's expert will convince the jury that in this case, the test taken was performed by biased and partial persons in the crime lab. He may well convince the jury that the multi-system test [is] an inferior one, given the circumstances of this case.

"He may very well convince the jury that there were contaminants which corrupted the results of the test. But that is evidentiary. That goes to the weight.

". . . I am satisfied, at this point, based upon the universal finding in this court, by my fellow trial judges, by the findings of the appellate court of the several states which are cited in [the prosecutor's] papers that notwithstanding Michigan, . . . that I should, rather than consume ten days, and create another 1200 page record, that I should, having taken judicial notice of these other proceedings, find there is no purpose in a *Kelly/Frye* hearing, having offered the defense ample opportunity to present, by offer of proof, that there would be new evidence, which evidence I would hear as a part of and incorporate it with the evidence taken at the prior hearings in order to arrive at a knowledgeable decision."

Assuming there was error in taking judicial notice of the earlier hearings, however, appellant would not be entitled to a reversal. First, as we will discuss more fully below, the other evidence indicative of appellant's guilt is overwhelming, thus rendering any error harmless under any appropriate test. (*Chapman* v. *California* (1967) 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Moreover, the issues framed by appellant have become moot in light of subsequent appellate developments. ■ In *Kelly,* our Supreme Court stated: "[O]nce a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*People* v. *Kelly, supra,* 17 Cal.3d at p. 32.) "[A]ppellate endorsement of a technique ends the need for case-by-case adjudication . . . ." (*People* v. *Brown, supra,* 40 Cal.3d at p. 530; see also *People* v. *Yorba* (1989) 209 Cal.App.3d 1017, 1023 [257 Cal.Rptr. 641].) ■ Thus, were we required to reverse the instant case, the prosecutor on remand could rely not only on the appellate decision in *Reilly* (*People* v. *Reilly, supra,* 196 Cal.App.3d 1127), but also on *People* v. *Morris* (1988) 199 Cal.App.3d 377 [245 Cal.Rptr. 52], in which it was held that the electrophoretic multisystem testing of dried bloodstains was also generally accepted within the scientific community. (See also *People* v. *Coleman* (1988) 46 Cal.3d 749, 779, fn. 23 [251 Cal.Rptr. 83, 759 P.2d 1260] [citing *Reilly* and *Morris* with approval], and *People* v. *Yorba, supra,* at p. 1023.) To remand the case for failure to hold a full-blown *Kelly/Frye* hearing in 1987 would now be a useless act.[4]

---

[4]Subsequent appellate developments in other jurisdictions concerning the general acceptance of electrophoresis within the scientific community parallel that in California. A growing number of states have held evidence of electrophoresis testing to be admissible. (See, e.g., *Santillanes* v. *State* (Nev. 1988) 765 P.2d 1147, 1150-1151; *Commonwealth* v. *Gomes* (1988) 403 Mass. 258 [526 N.E.2d 1270, 1278-1279] and cases cited therein; see, generally, Annot., Admissibility, in Criminal Cases, of Evidence of Electrophoresis of Dried Evidentiary Bloodstains (1988) 66 A.L.R.4th 588, 593-601, § 3(a) and cases cited therein.) A decision by the Michigan Supreme Court remains as the major exception. (*People* v. *Young* (1986) 425 Mich. 470 [391 N.W.2d 270, 286, 66 A.L.R.4th 545]; see Annot., *supra,* 66 A.L.R.4th 588, 602, 605, § 4(a) and cases cited therein.)

At least six states have held the multisystem method to be generally accepted in the relevant scientific community. (See *People* v. *Morris, supra,* 199 Cal.App.3d at pp. 383-390 [California]; *Commonwealth* v. *Gomes, supra,* 526 N.E.2d at p. 1279 [Massachusetts]; *Santillanes* v. *State, supra,* 765 P.2d at p. 1150 [Nevada]; *State* v. *Adams* (S.D. 1988) 418 N.W.2d 618, 621 [South Dakota]; *Plunkett* v. *State* (Okla.Crim.App. 1986) 719 P.2d 834, 839-840 [Oklahoma]; *State* v. *Washington* (1981) 229 Kan. 47 [622 P.2d 986, 992-993 [Kansas].)

The Nevada Supreme Court has specifically concluded that the trustworthiness and reliability of the Wraxall Multi-System method of electrophoresis analysis was such that the test results could be presented to the jury. (*Santillanes* v. *State, supra,* 765 P.2d at pp. 1150-1151.)

### 3. *Admissibility of Bloodstain Analysis in This Case*

■ Once it is shown that a new scientific technique is reliable and generally accepted within the relevant scientific community, it is then necessary that "the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject." (*People* v. *Kelly, supra,* 17 Cal.3d at p. 30, italics in original.) "Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case." (*Ibid.*)

■ Again, appellant makes a prolonged argument, challenging in six ways the qualifications of Alan Keel, criminalist for the Oakland Police Department, as well as the specific testing procedures used by that police department. In much of this portion of his argument, appellant seems to confuse the standards required of a "qualified" or "impartial" expert called upon to testify on the first issue in a *Kelly/Frye* hearing relating to scientific acceptance in general with the expert who may testify about the particular case on a case-specific basis. (See *People* v. *Brown, supra,* 40 Cal.3d at p. 530.) In *Kelly,* for purposes of determining acceptance in the scientific community, the court criticized reliance upon "technicians," "law enforcement officers," or those scientists closely identified with the development and promotion of a particular technique. (*People* v. *Kelly, supra,* 17 Cal.3d at pp. 38-39.)

On the other hand, the witness typically called upon as an expert to give an opinion on the scientific procedure used in a particular criminal case is often a laboratory technician employed by a local law enforcement agency. "'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' (Evid. Code, § 720, subd. (a).) ■ The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. [Citations.]" (*People* v. *Kelly, supra,* 17 Cal.3d at p. 39.) ■ Once the court acts within its discretion and finds the witness qualified, as it did in this case, the weight to be given the testimony is for the jury to decide.

---

Finally, we note with interest the recognition by the South Dakota Supreme Court that the multisystem method of applying the principle of electrophoresis had generated the most confrontation as to the reliability of electrophoresis in the several states. It said that the issue appeared to result from a continuing disagreement among the several scientists responsible for its development. That court held, however that it was "not necessary to discuss the respective merits of each position as the decision that electrophoresis satisfies the *Frye* test dictates that *criticism of the specific methodology employed goes to the credibility of the testimony, not admissibility.*" (*State* v. *Adams, supra,* 418 N.W.2d at p. 621, italics added.)

 Appellant had full opportunity to cross-examine criminalist Keel's qualifications and methods, and to present whatever evidence he desired challenging them. Much of appellant's argument at this level is directed toward a perceived bias on the part of Mr. Keel, as well as alleged careless testing procedures on the part of the Oakland Police Department laboratory. "Careless testing affects the weight of the evidence and not its admissibility, and must be attacked on cross-examination or by other expert testimony." (*People* v. *Farmer* (1989) 47 Cal.3d 888, 913 [254 Cal.Rptr. 508, 765 P.2d 940].) For these reasons, this set of contentions must fail.

4. *Statistical Testimony*

C.-E.*

. . . . . . . . . . . . . . . . . . . .

## III. CONCLUSION

The judgment is affirmed; the petition for writ of habeas corpus (No. A046234) is denied.

Poché, Acting P. J., and Perley, J., concurred.

A petition for a rehearing was denied November 1, 1989, and appellant's petition for review by the Supreme Court was denied January 24, 1990.

---

*See footnote, *ante,* page 19.