**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Stephen Barry SCHER, Appellant.**

Superior Court of Pennsylvania.

Argued March 2, 1999.

Filed June 7, 1999.

---

John P. Moses, Wilkes-Barre, for appellant.

Marianne E. Kreisher, Deputy Atty. Gen., Harrisburg, for Com., appellee.

Before McEWEN, President Judge, POPOVICH, J., and CIRILLO, President Judge Emeritus.

CIRILLO, President Judge Emeritus:

¶ 1 Dr. Stephen Barry Scher, M.D., appeals from a judgment of sentence entered in the Court of Common Pleas of Susquehanna County. We reverse.

¶ 2 This case arises from the June 2, 1976 shooting death of Martin Dillon, which occurred at "Gun Smoke," a hunting camp owned by the Dillon family. Dillon was killed as a result of being shot in the chest with Dr. Scher's sixteen-gauge shot-

gun. Dr. Scher and Dillon were the only persons present at Gun Smoke that day; the two friends had gone to the camp, as was their custom, to partake in skeet shooting.

¶ 3 On June 27, 1997, more than twenty years after the date of the alleged crime, Dr. Scher was arrested for Dillon's murder. A jury convicted Dr. Scher of first-degree murder; he was sentenced to life imprisonment. Post-trial motions were filed and denied. On appeal, Dr. Scher raises thirteen issues for this court's consideration; we, however, limit our analysis to the following issue, as it requires us to reverse Dr. Scher's conviction:

> Did the trial court err in denying defendant's motion to dismiss because of pre-arrest delay when the defendant was arrested over twenty years after the date of the alleged crime, when evidence and witnesses were lost over that time period, when there was no investigation for eighteen (18) years, and when any new evidence produced was readily available and obtainable in 1976?

¶ 4 Citing *Commonwealth v. Snyder*, 552 Pa. 44, 713 A.2d 596 (1998), Dr. Scher argues that his constitutional right to due process was violated as a result of a twenty-year pre-arrest delay. He further alleges that the delay was improper and prejudiced his ability to present his defense. The Commonwealth argues that Dr. Scher suffered no such prejudice and that the delay was not for improper reasons because it was not the result of the Commonwealth's quest to gain a tactical advantage over Dr. Scher. Resolving this issue requires us to examine in detail pre-arrest delay jurisprudence under Section 1 of the Fourteenth Amendment to the United States Constitution and under Article 1, Section 9 of the Pennsylvania Constitution.[1]

¶ 5 The determination of whether a pre-arrest delay is considered reasonable under the facts of a particular case is within the discretion of the trial court. *Commonwealth v. Montalvo*, 434 Pa.Super. 14, 641 A.2d 1176, 1182 (1994) (citing *Commonwealth v. Middleton*, 379 Pa.Super. 502, 550 A.2d 561, 562–63 (1988)). We will reverse only where there is insufficient evidence in the record to support the trial court's determination. *Id.*

¶ 6 In this Commonwealth, there is no statute of limitation for murder prosecutions. 42 Pa.C.S.A. § 5551. Statutes of limitation are not, however, the sole protection afforded to the accused with respect to the time within which charges must be filed. *See Snyder, supra.* "The constitutional right to due process also protects defendants from having to defend stale charges, and **criminal charges should be dismissed if improper pre-arrest delay causes prejudice to the defendant's right to a fair trial.**" *Snyder* at 51, 713 A.2d at 600 (citation omitted) (emphasis added). However, "[o]ur appellate courts have affirmed convictions in numerous cases in which defendants were arrested and convicted of homicide charges many years after the commission of a crime due to **lengthy investigations and/or recently discovered evidence.**" *Id.* at 51, 713 A.2d at 599 (citations omitted) (emphasis added).

¶ 7 In *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the United States Supreme Court addressed the issue of pre-indictment delay

---

1. Article 1, Section 9 of Pennsylvania's Constitution is commonly referred to as the due process clause, and it provides as follows:
   [N]or can an accused be deprived of his life, liberty, or property unless by the judgment of his peers or law of the land.
   Pa. Const. art. 1, § 9, 42 Pa.C.S.A. Our supreme court has consistently held that the phrase "law of the land" is commensurate with the due process clause of our federal constitution. *See Snyder* at 52, 713 A.2d at 600 (citing *Commonwealth v. Davis*, 526 Pa. 428, 586 A.2d 914 (1991)). Accordingly, the supreme court has also held that the due process clause of the Pennsylvania Constitution provides defendants no greater protections than its federal counterpart in the area of pre-arrest delay. *Snyder* at 54, 713 A.2d at 602.

and noted that the due process clause plays a limited role in protecting against oppressive delay. *Marion, supra. See United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). The *Marion* Court stated:

> The Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain a tactical advantage over the accused.

*Id.* at 324, 92 S.Ct. 455 (citation omitted). Thus, the court made it clear that although proof of prejudice is necessary to succeed on a due process claim, there must also be an inquiry into the reasons for such a delay. *Marion, supra ; Lovasco, supra.*

¶ 8 In *Lovasco, supra*, the United States Supreme Court once again addressed the issue of pre-indictment delay. In that case, the Court followed its decision in *Marion*, stating that "prosecutors do not deviate from fundamental conceptions of justice when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause." *Lovasco* at 790–91, 97 S.Ct. 2044. The Court recognized that no interests, including those of the prosecutors, the courts and the defendants, would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so. *Id.* at 792, 97 S.Ct. 2044. The Court held that:

> In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," United States v. Marion, 404 U.S. at 324, 92 S.Ct. at 465, precisely because investigative delay is not one sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," Smith v. United States, 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041 (1959). This the Due Process Clause does not require.

*Id.* at 795–96, 97 S.Ct. 2044 (quoting *Smith v. United States*, 360 U.S. 1, 10, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959)).

¶ 9 In its *Marion* and *Lovasco* decisions, the Supreme Court clearly articulated that in order for a defendant's due process claim for pre-arrest delay to be ripe for adjudication, the defendant must make a showing of prejudice that is actual, concrete, and non-speculative. The Court held that if the defendant proves actual prejudice, an inquiry must then be undertaken to determine whether the Commonwealth's reasons for the delay were improper. *Lovasco, supra ; Marion, supra.* However, with respect to the inquiry into the Commonwealth's reasons for delay, the Court did not articulate a clear standard for the lower courts to follow in determining what rises to the level of improper conduct on the part of the prosecution.

¶ 10 Our appellate courts have employed differing standards with respect to the second element of the *Marion/Lovasco* test. In one line of cases, this Commonwealth's appellate courts have followed the Supreme Court's decision in *Marion* and *Lovasco*, employing a balancing test in which the Commonwealth's reasons for the delay are measured against the prejudice to the accused's interest in a reliable process of guilt determination. *See, e.g., Commonwealth v. Crawford*, 468 Pa. 565, 364 A.2d 660 (1976); *Commonwealth v. DeMarco*, 281 Pa.Super. 62, 421 A.2d 1147 (1980); *Commonwealth v. DeRose*, 225 Pa.Super. 8, 307 A.2d 425 (1973); *Commonwealth v. McCloud*, 218 Pa.Super. 230, 275 A.2d 841 (1971). In those cases, the courts "gave full recognition and approval to the legitimate police purposes often served by delaying arrests **in order [for the police] to**

**conduct full criminal investigations."** *DeMarco, supra* at 67, 421 A.2d 1147 (citation omitted) (emphasis added).

¶ 11 Another line of cases, citing *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978) and *Marion, supra*, state that the settled standard for determining if there has been a pre-arrest delay that contravenes the fundamental conceptions of justice requires that an inquiry be made as to whether: (1) the delay causes actual and substantial prejudice to the defendant, and (2) the government has intentionally delayed prosecution solely to gain a tactical advantage over the defendant. *Commonwealth v. Montalvo*, 434 Pa.Super. 14, 641 A.2d 1176, 1182 (1994); *Commonwealth v. Cagle*, 398 Pa.Super. 147, 580 A.2d 884, 886 (1990); *Commonwealth v. Lightman*, 339 Pa.Super. 359, 489 A.2d 200, 204 (1985). These cases, however, misconstrue the United States Supreme Court's holding in *Marion, supra*.[2]

¶ 12 In *Daniels, supra,* our supreme court quoted *Marion*, stating that " 'the Due Process Clause . . . would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to (defendants') rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.' " *Daniels, supra* at 355, 390 A.2d at 180. The problem with the use of this language is that the *Daniels* court took it out of context by omitting the preceding language, which stated that the government, in *Marion*, was conceding that such facts would be considered a due process violation. In no way did the *Marion* court accept the foregoing language as the minimum requirement to establish that the conduct of the prosecution was improper.

¶ 13 Moreover, in cases where our appellate courts found that an accused's due process rights had not been infringed upon, they have also found either that the accused had suffered no actual prejudice

or that the investigation was reasonable in light of the need for a lengthy and ongoing criminal investigation. *See e.g., Commonwealth v. Colson*, 507 Pa. 440, 453, 490 A.2d 811, 816 (1985) (three year pre-arrest delay "was reasonable in view of the initial difficulty experienced by the police in ascertaining the facts, [a]ppellant's absence from the Commonwealth, and the diligent efforts to locate all of the suspects"). *See also Commonwealth v. Daniels, supra* (holding that where there is no showing that material witnesses were lost to the defense, appellant's claim must fail because he has shown no actual prejudice resulting from the delay); *Crawford, supra* at 569, 364 A.2d at 662 (supreme court held that the Commonwealth had not violated accused's due process rights where "the case was very difficult to solve because of the scientific nature of the evidence"); *Commonwealth v. Arnold*, 331 Pa.Super. 345, 480 A.2d 1066, 1075 (1984) (delay was justified and outweighed any prejudice to the appellant where "assiduous investigation" was conducted by police).

¶ 14 Our supreme court most recently examined the issue of pre-arrest delay in *Commonwealth v. Snyder, supra*. In *Snyder*, the appellant was convicted of first-degree murder; he argued that his due process rights had been violated, claiming that evidence rendered unavailable to him by the passing of time was exculpatory and its unavailability substantially prejudiced him in presenting his defense that the victim committed suicide. *Id.* at 47, 713 A.2d at 597. The *Snyder* court applied the *Marion/Lovasco* test, requiring that the court determine: 1) whether the pre-arrest delay resulted in actual prejudice to the appellant and 2) whether the Commonwealth's reasons for postponing the appellant's arrest were proper. *Id.* at 57–58, 713 A.2d at 602–603.

---

**2.** It is important to note, however, that in none of the foregoing cases was the court required to determine the propriety of the prosecution's conduct, as the appellant was unable to prove the requisite prejudice.

¶ 15 With respect to the first prong of the *Marion/Lovasco* test, the *Snyder* court held that the appellant had suffered actual prejudice because witnesses became unavailable due to the passage of time and because the record "[was] replete with instances where prosecution and defense witnesses ... changed their testimony or could not remember specific details when they testified at trial." *Id.* at 58, 713 A.2d at 603.

¶ 16 As to the second prong of the *Marion/Lovasco* test, the *Snyder* court found it significant that the investigation remained dormant for seven years and that during that time **no new evidence surfaced.** *Id.* Moreover, the record in that case was "totally devoid of evidence establishing the reason for deferring the [a]ppellant's arrest." *Id.* In *Snyder*, the Commonwealth argued, citing *Colson, supra,* that it was not required to prosecute the appellant sooner.[3] *Id.* at 60, 713 A.2d at 603. The supreme court distinguished the facts of *Snyder* from those of *Colson,* emphasizing that in *Colson* the Commonwealth **pursued a diligent investigation,** whereas in *Snyder,* there was no evidence of such an investigation. *Id.* (emphasis added).

¶ 17 The *Snyder* court also distinguished the facts before it from those of *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987), wherein it held that the Commonwealth's **reasons for the delay were proper where new information enabled the police and district attorney's office to locate and persuade witnesses to testify at the defendant's trial.** In distinguishing the facts of *Sneed,* the *Snyder* court emphasized that:

> [I]n *Sneed,* the police did not gather sufficient evidence to arrest the defendant, nor did they know where he was, because the defendant fled to Georgia, where he was arrested on unrelated charges. His cellmates in Georgia then provided information to prison authorities about the defendant's involvement in the Pennsylvania murder, and when the Georgia Police contacted the Philadelphia police, they reactivated their investigation.

*Snyder* at 60, 713 A.2d at 604.

¶ 18 Recognizing that the Commonwealth's efforts to bring Snyder to trial could not be gleaned from the record, the supreme court remanded the case to the trial court for the purpose of discovering if there were valid reasons to justify such an egregious delay. *Id.* at 63, 713 A.2d at 605. In so holding, the court annunciated that it **"expressly disapproves of subjecting defendants to delayed prosecutions in cases in which changing prosecutorial policies are the only reason to revive dormant investigations after the passage of time causes actual prejudice to the defense."** *Id.* at 62, 713 A.2d at 605 (emphasis added). The supreme court did not, however, specifically set forth a standard for lower courts to apply in evaluating the propriety of an investigation undertaken by the Commonwealth and, as we have stated, our case law reveals no other standard. We are, therefore, compelled to look beyond our jurisdiction for guidance in the application of the second prong of the *Marion/Lovasco* test.

¶ 19 In *United States v. Mays,* 549 F.2d 670 (9th Cir.1992), the Ninth Circuit Court of Appeals addressed the issue of pre-indictment delay. In that case, the court recognized that generally, courts have given an ample amount of leeway to the government in their decisions as to the timing of arrests and indictments. *Id.* at 678 (citations omitted). This is especially true where an **ongoing investigation justified the delay.** *Id.* (emphasis added). It further recognized that:

> [I]ntentional delays for improper purposes will not be sanctioned. In addition, although weighted less heavily than deliberate delays, **negligent conduct can also be considered, since the ultimate responsibility for such circum-**

---

3. In *Colson, supra,* our supreme court rejected a claim that a defendant was denied due process of law by the passing of more than three years before his arrest.

stances must rest with the government rather than the defendant. Where the defendant has established actual prejudice due to an unusually lengthy government-caused pre-indictment delay, it then becomes incumbent upon the government to provide the court with its reason for the delay.

*Id.* (citations omitted) (emphasis added). The court added, citing *Marion, supra,* that:

[T]he standard to be used [in a due process claim for pre-indictment delay] has to do with where the fulcrum for the balancing test is to be placed. In *Marion*, the Court states that the presence of actual prejudice resulting from pre-indictment delays would not by itself warrant the dismissal of a criminal prosecution. The greater the length of the delay and the more substantial the actual prejudice to the defendant becomes, the greater the reasonableness and the necessity for the delay will have to be to balance out the prejudice. However, despite the degree of actual prejudice, **for a judgment in favor of dismissal, there must be some culpability on the government's part either in the form of intentional misconduct or negligence**.

*Id.* (emphasis added).

¶ 20 We find the foregoing well-reasoned analysis authored by Senior Circuit Judge Barnes of the Ninth Circuit Court of Appeals instructive, and we adopt it for purposes of applying the second prong of the long-standing *Marion/Lovasco* test. Therefore, where there has been an excessive and prejudicial pre-arrest delay, we will not only inquire as to whether there has been any intentional delay by the prosecution to gain a tactical advantage over the accused, but we will also consider whether the prosecution has been negligent by failing to pursue a reasonably diligent criminal investigation.

¶ 21 In the case at bar, the trial court, at a pre-trial hearing, was called upon to review Dr. Scher's due process claim sounding in pre-arrest delay. It employed a test, citing *Marion* and *Daniels, supra,* that required Dr. Scher to show that he had suffered substantial prejudice from the pre-arrest delay and that the prosecuting authorities delayed filing criminal charges in order to obtain a tactical advantage over the defendant. As we have pointed out, this is not the correct standard for evaluating a due process claim sounding in pre-arrest delay. We will, therefore, evaluate the facts of the present case under the standard adopted above.

¶ 22 Presently, a review of the record shows that on June 2, 1976, Dillon was killed as a result of a gunshot wound to the chest; the shot was discharged from Dr. Scher's sixteen-gauge shotgun. Following the shooting, an investigation commenced to determine whether the shooting was accidental or intentional.

¶ 23 The record reflects the testimony of Edward Little, Esquire, who was the Susquehanna County District Attorney from the years 1968 to 1980. In his testimony, Mr. Little stated that following the shooting, evidence from the crime scene was gathered. Mr. Little stated that Chief County Detective Willard G. Collier, who was deceased at the time of Dr. Scher's arrest, headed the investigation. According to Mr. Little, Detective Collier was in charge of reviewing the evidence found at the scene of the crime and Mr. Little relied on Detective Collier to do so. Mr. Little further testified that Detective Collier had a strong belief that the shooting may not have been an accident and that Dr. Scher may have been responsible.

¶ 24 When questioned about his own involvement in the investigation, Mr. Little testified that he did not order laboratory tests and that he did not recall ever seeing any photographs taken in relation to the incident. He did testify, however, that he had conducted interviews of those who were involved in the investigation. One of the persons interviewed was Coroner John Conarton, who also died prior to Dr. Scher's arrest. At the time of the investigation, it was Coroner Conarton's opinion

that Dillon's death was accidental and he so stated on Dillon's death certificate.

¶ 25 Mr. Little also testified that he spoke with Dr. James Grace, who conducted the autopsy following the shooting. Dr. Grace, like Coroner Conarton and Detective Collier, was also deceased at the time of Dr. Scher's arrest. In his autopsy report, the cause of death was determined to be a gunshot wound to the chest. Dr. Grace did not opine whether the death was accidental or the result of a homicide.

¶ 26 According to Mr. Little, no arrest was made in connection with the Dillon shooting from 1976 until the time he left office in 1980. The only reason given by Mr. Little for not making an arrest was that he had not acquired sufficient evidence to prosecute the case. He further stated that he did not delay the prosecution in order to gain a tactical advantage.

¶ 27 In January of 1980, Laurence Kelly, Esquire, succeeded Mr. Little as the District Attorney of Susquehanna County; he remained in that office through January of 1988. At a pre-trial hearing, Mr. Kelly testified that during his term as District Attorney: he never looked at the Dillon file, nor did he come across it, he never opened a new file concerning the Dillon shooting; he did not gather additional evidence; he did not receive any correspondence regarding Dillon's death and; he did not know of any other investigations in the matter. In short, there was no activity on the Dillon case for at least the eight years that Kelly was in office. Mr. Kelly also testified that his inactivity regarding the Dillon shooting was not prompted by an intention to gain a tactical advantage over Dr. Scher.

¶ 28 In January of 1988, attorney Jeffrey Snyder took office as the District Attorney for Susquehanna County; he held that office until 1995. Mr. Snyder was first exposed to the Dillon case almost a full year after he took office. Mr. Snyder's exposure to the case came by way of a request from the Dillon family to have a meeting. Mr. Snyder first learned of the background of the shooting at the time of that meeting.

¶ 29 In 1989, approximately 13 years following the shooting, a Pennsylvania State Police investigation commenced. Mr. Snyder encouraged the State Police to move the investigation forward. Later in 1989, following an investigation into the matter, Mr. Snyder decided that a successful prosecution could not be mounted. In fact, Mr. Snyder did not even feel confident that there was a sufficient basis to petition the court for permission to exhume Dillon's body.

¶ 30 Then, in 1994, nearly eighteen years following Dillon's death, Troopers Stoud and Schmidt were assigned to the case. The two troopers began a completely new investigation into the Dillon matter. As a result of their investigation, Mr. Snyder's office was able to obtain a court order granting permission to exhume and re-autopsy Dillon's body. Dillon's body was exhumed and Dr. Isidore Mihalakis performed a second autopsy. Following the re-autopsy, the death certificate was amended to reflect a change in the manner of death from accident to homicide.

¶ 31 As to the first prong of the *Marion /Lovasco* test, Dr. Scher argues that he has suffered actual and concrete prejudice as a result of the pre-arrest delay. We agree.

¶ 32 Initially, we note that there were numerous instances at the preliminary hearings and at trial where witnesses were unable to remember many facts because their memories had waned over the preceding twenty years. Moreover, many key witnesses were deceased at the time of trial.

¶ 33 One of the issues upon which the Commonwealth focused was the distance between the barrel of the gun and Dillon's chest. The Commonwealth's expert, Dr. Mihalakis, testified at a pre-trial hearing that the barrel of the gun was approximately three to five feet away from Dillon's body when the shot was fired. He,

therefore, opined that this shooting could not have been an accident or suicide. Dr. Mihalakis based this conclusion on his autopsy finding that there was no blackening or powder found at the wound of entry. Significantly, this was contrary to Dr. Grace's findings, which were recorded in his autopsy report dated June 3, 1976. In that report, Dr. Grace noted that the area around the penetration was darkened with what were apparent to him as powder burns. We will never know why and how Dr. Grace arrived at his conclusions as he died in 1995 without having had an opportunity to explain his findings.

¶ 34 Detective Collier, the county detective assigned to the case in 1976, was of the opinion that Dillon's death may not have been an accident. We, however, will never know why he made such a determination or why he did not further pursue the investigation as he also died prior to Dr. Scher's arrest.

¶ 35 Also deceased at the time of trial was John Conarton, who was the Susquehanna County Coroner at the time of Dillon's death. Coroner Conarton's signature appeared on Dillon's initial death certificate, and it was his opinion that the death was accidental. Due to Conarton's death, Dr. Scher was not able to question Conarton at trial. We will, therefore, never know why Conarton believed Dillon's death to be accidental.

■■■ ¶ 36 Whether or not the prolonged delay by the Commonwealth in prosecuting its case was intentional, it caused the Commonwealth to gain a remarkable advantage over Dr. Scher. As stated above, certain important witnesses were deceased and, therefore, unavailable to Dr. Scher in presenting his case. Moreover, numerous witnesses called by both the Commonwealth and Dr. Scher were unable to remember facts relevant to this case. Our appellate courts, along with the United States Supreme Court, have found substantial and actual prejudice where memories of witnesses have dimmed, witnesses have become unavailable, and evidence has been lost due to prosecutorial delay. *Marion, supra*; *Snyder, supra*. This prejudice, however, cannot be speculative in nature, it must be actual and concrete. *Snyder, supra*. *See Sneed, supra* (where witness died during delay in filing charges defendant is required to show how witnesses would have tended to exculpate him). Presently, we find that Dr. Scher's case suffered actual and concrete prejudice due to memory loss and the death of important witnesses whose testimony could have explained the contradictions between the findings of the initial investigation conducted in 1976 and those of the more current investigation conducted nearly eighteen years later.

¶ 37 Having found that Dr. Scher has suffered actual prejudice as a result of the Commonwealth's pre-arrest delay, we will next determine whether the Commonwealth's reasons for the 20–year delay were proper. *Marion, supra*; *Lovasco, supra*.

¶ 38 As we discussed above, the shooting occurred in 1976, and at that time an investigation commenced to determine whether Dillon's death was accidental or the result of a homicide. The District Attorney's office, following an investigation, determined that there was insufficient evidence to proceed with an arrest. Thereafter, an eight-year lapse of activity ensued. In fact, the incumbent District Attorney from 1980 until 1988 had no knowledge that the Dillon file existed. It was not until 1989, following a personal request from the Dillon family, that the investigation was reopened. However, a comprehensive investigation was not commenced until 1994, nearly 18 years following Dillon's death.

¶ 39 Although we are convinced that the delay caused by former District Attorneys Little and Kelly was not due to intentional misconduct, we cannot find that their investigation was one of reasonable diligence. There was no ongoing criminal investigation; in fact, there was no activity whatsoever regarding the case for more than eight years. Even Deputy Attorney

General Campolongo, the prosecuting attorney in this matter, criticized the Commonwealth's investigation, when he stated at a preliminary hearing that: "A proper autopsy was not conducted, and a proper investigation was not done until fairly recently when this matter was brought to the attention of ... the state police and to the attention of [the Attorney General's] office."

¶ 40 In its brief, the Commonwealth contends that in 1994, two newly assigned State Troopers conducted a thorough investigation and located witnesses who led them to the discovery of a rumor that prior to Dillon's death, Dr. Scher was having an affair with Dillon's wife, Patricia Dillon. Significantly, all of the witnesses who were interviewed by the Commonwealth in 1994 were alive in 1976. Moreover, in 1978, Dr. Scher married Patricia Dillon; a reasonable ongoing investigation at that time could have uncovered the fact that Dr. Scher and Patricia Dillon were having an affair in 1976.

¶ 41 The Commonwealth contends further that it discovered new evidence and that new testing was performed on the physical items. The record belies this assertion, as even during Mr. Snyder's term as District Attorney, there was no newly discovered evidence. The Commonwealth was in possession of no more evidence in 1996 than was available to it in 1976. For nearly twenty years the Commonwealth had evidence in its possession including: the clothing worn by Dr. Scher and Dillon on the date of the shooting; Dillon's 20–gauge shotgun; Dr. Scher's sixteen-gauge shotgun; ammunition and spent shells found at the scene of the shooting; shooting glasses and ear protectors found at the scene; the autopsy report of Dr. James Grace; and the death certificate signed by Coroner John Conarton. The Commonwealth had the same opportunity to examine the body in 1976 as it did in 1995 when the subsequent autopsy was performed. Moreover, any new tests performed by the Commonwealth and the Federal Bureau of Investigation failed to reveal any new and/or relevant information that could not

have been discovered by testing procedures available to them in 1976.

 ¶ 42 The investigation conducted by the Commonwealth was far from proper. In 1996, it had at its possession no evidence or witness that was not available to it in 1976 when the shooting occurred. Moreover, we cannot find, prior to the commencement of the most recent investigation in 1994, any instance where the Commonwealth diligently pursued an investigation in this case. We find the Commonwealth's inactivity regarding this case to be grossly negligent, as it has provided us with no proper reasons for such an egregious prolonged delay. *Mays, supra.*

¶ 43 In conclusion, we find that the Commonwealth's twenty-year pre-arrest delay was improper and that it caused substantial prejudice Dr. Scher's right to a fair trial. *Lovasco, supra* ; *Marion, supra.*

¶ 44 Judgment of sentence reversed. Appellant is discharged.