COMMONWEALTH of Pennsylvania,
Appellee,

v.

Keith E. SNYDER, Appellant.

Superior Court of Pennsylvania.

Argued June 19, 2000.

Filed Oct. 17, 2000.

John P. Moses, Wilkes–Barre, for appellant.

Scott C. Gartley, Asst. Dist. Atty., Wilkes–Barre, for Com., appellee.

BEFORE: CAVANAUGH, KELLY, POPOVICH, JOHNSON, HUDOCK, FORD ELLIOTT, EAKIN, TODD and MONTEMURO,* JJ.

CAVANAUGH, J.:

¶ 1 Did the trial court err when it concluded that there were valid reasons to justify the delay in filing the criminal charges against Keith Snyder until they were filed and that the reasons for the delay in filing the charges were proper?

¶ 2 This case was remanded to the trial court for the sole purpose of making the above determination with the direction that a finding of the absence of valid reasons for the late filing of the charges would mandate vacation of the judgment of sentence and discharge of the appellant. The court, after an extensive hearing, found valid reasons for the delay and that the delay was proper and, of course subject to review, affirmed the judgment of sentence.

¶ 3 The core issue under scrutiny in the trial court and in the decision of the supreme court, which remanded for the hearing, is whether appellant Snyder had been deprived of his constitutional right to due process by reason of the pre-arrest delay of over eleven years from the time of the alleged offense.[1]. In the supreme court decision which remanded, the court equated the delay in prosecution issue under the Pennsylvania Constitution to due process under the Fourteenth Amendment of the United States Constitution and placed reliance upon two cases decided in the United States Supreme Court. *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) and *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). Accordingly, our supreme court in *Snyder* stated, "Thus, the *Marion* and *Lovasco* decisions stand for the proposition that to establish a due process violation for delay in prosecution, a defendant must show that the passing of time caused actual prejudice and that the prosecution lacked sufficient and proper reasons for postponing the prosecution". *Commonwealth v. Snyder*, 552 Pa. 44, 713 A.2d 596 at 601 (1998). After a review of the evidence from the trial, the court then concluded that the delay in prosecution did result in actual prejudice to appellant. The court, again following the *Marion/Lo-*

---

* Retired Justice assigned to the Superior Court.

1. *Commonwealth v. Snyder*, 552 Pa. 44, 713 A.2d 596 (1998).

*vasco* analyses, concluded that the record was inadequate to determine if the second prong of the standard, whether the reasons for the delay were proper, was proven, and, thus, remanded.

### Burden of Proof

¶ 4 At the outset, the parties are in disagreement as to the allocation of the burden of proof which governed the hearing on remand. Appellee Commonwealth cites language in *Snyder* ". . . to establish a due process violation. . . a *defendant must show* that. . ." *Commonwealth v. Snyder*, 713 A.2d at 601. Also cited is language from *Commonwealth v. Clayton*, 516 Pa. 263, 532 A.2d 385 (1987), "appellant must show" and "appellant has failed to produce", 532 A.2d at 387–8 n. 2, and *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978), "appellant's claim must fail because he has shown no actual prejudice", 390 A.2d at 181. On the other hand, appellant argues, not unpersuasively, that if the burden were not on the Commonwealth, there would be no reason to remand for a further hearing. We conclude that it is not necessary to decide this issue in our disposition since, although the hearing court did not explicitly discuss the allocation of burden of proof, it is apparent that the matter was considered in the light of the burden being placed on the Commonwealth. It is certainly clear that the Commonwealth assumed the burden of going forward with the evidence. At the remand hearing conducted on August 6 and August 7, 1998, it was the Commonwealth which went forward and produced all the witnesses and, in fact, the defendant rested without offering any evidence. This was to be expected since on an issue of the propriety for a delay in prosecution, substantially all of the evidence is in the hands of the Commonwealth. Viewed in this context, the hearing court viewed its mandate as one of discovering whether there were valid reasons to justify the filing of charges after the extensive delay. In execution of this mandate, the court concluded that the reasons for the delay were valid and proper. From the court's exhaustive discussion of the evidence, it is evident that it was found that the evidence preponderated in favor of the Commonwealth's position.

### The Prosecutor's Duty

¶ 5 In remanding for a hearing, the supreme court was explicit. The trial court was charged to determine if the delay was proper or improper. The court concluded that appellant was actually prejudiced by the delay and sought a determination of whether there were valid reasons to justify the delay. In making such a determination, it is apparent that a court is somewhat confounded. The inquiry necessarily immerses the judicial branch of government in an assessment of the performance of the executive which, of course, has distinct constitutional obligations and variant calls for service by its constituency. The ready legal analogy is to the familiar line of cases which interpret the right to a speedy trial. The accused's right to a speedy (prompt) trial is rooted in Amendment VI of the United States Constitution and Article I, Section 9 of the Constitution of Pennsylvania. However, other than the commonality that they both implicate a burden on the judiciary to assay the performance of the executive prosecutor, there exist marked differences between an accused's right to a prompt trial after an accusation has been lodged and a citizen's right to be seasonably charged after a criminal episode. In the first instance, which finds its expression in Pa.R.Crim. P. 1100, the accused has already been subjected to public charges and has a right to a public trial to defend against the state, and demonstrate his innocence or, at least, the overstatement of the charges. In such instance, it is altogether reasonable that the law should require the prosecutor, having made a claim which brings a citizen into a position of obloquy and dishonor to proceed with promptitude with proof of his assertion. Appropriately, in such circumstances the prosecutor is burdened with an

obligation to act with due diligence to prepare and proceed to trial. Pa.R.Crim.P. 1100(g).

■ ¶ 6 Conversely, the citizen who may be a suspect, has certain rights—not to a prompt trial—but to be free from an extraordinary pre-arrest delay which may render charges constitutionally infirm. This infringement is based upon Amendment XIV, Section 1 of the United States Constitution and Article I, Section 9 of the Constitution of Pennsylvania as part of the "law of the land". *See Commonwealth v. Snyder, supra.* In these circumstances, the law has not imposed a due diligence standard, but rather, as instantly, has sought to determine if there has been actual prejudice and if there has been valid or proper reason for delay. While recognizing that the law imposes a constitutional duty on the prosecutor, our courts have been careful not to invade the prerogatives of the prosecutor and to respect the quotidian decision making responsibility which attaches to that high office. Accordingly, the supreme court in *Marion, supra,* relied on the absence of evidence that there was intentional delay to gain a tactical advantage. In *Lovasco,* the court noted that no one's interest is well served by compelling prosecution as soon as they have gathered evidence of probable cause. The court further recognized that charging decisions often involve policy considerations which should be free from interference. It also opined with approval that investigative delay until a prosecutor is "completely satisfied" that he should prosecute and be able to "promptly establish guilt beyond a reasonable doubt" is consistent with fair play and decency. *Id.,* 431 U.S. at 793–95, 97 S.Ct. 2044.

¶ 7 In our own jurisdiction, our supreme court has specifically rejected the claim that courts should hold prosecutors to a duty to prosecute promptly when it appears that a probable case is demonstrable. *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172, 180 (1978). In *Commonwealth v. Clayton, Id.,* at 516 Pa. 263, 532 A.2d 385 (1987), the court rejected the unreasonable delay argument on the basis that there was a failure to show "that delay was a deliberate tactical move in bad faith by the Commonwealth". 516 Pa. 263, 532 A.2d 385, 388. This court has rejected a delay in prosecution argument on the basis, *inter alia,* that there was no showing that the delay was "motivated by improper considerations" or was "deliberate or purposeful". *Commonwealth v. Patterson,* 392 Pa.Super. 331, 572 A.2d 1258, 1263 (1990). In *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987), it was opined that even in the face of prejudice, delay is excusable if it is a derivation of reasonable investigation.

### The Hearing on Remand

■ ¶ 8 At the hearing before Judge Mundy, the Commonwealth assumed the responsibility of going forward with the evidence, as well as, implicitly, the burden of proof that the reasons for the delay were both valid and proper. In order to do so, it called as witnesses the decision and policy-makers who were in authority from the time of the fatal arson to the time of appellant's arrest. The District Attorney of Luzerne County, at the time of the fatal fire, Robert J. Gillespie, Jr., established that the victims were appellant's wife, Diane, and his 36 day-old son, Brian, and that Keith Snyder, appellant, was a suspect. Two aspects of the case which were problematic, were the burn time of the fire and the presence of the drug tuinal in Diane's bloodstream. He opined that, while he felt there was sufficient evidence to arrest appellant, he was not satisfied that there was enough to achieve a conviction. Gillespie was in office from January 1982 to December 1985. In the fall of 1984, he was authorized to empanel what he described as the first investigating Grand Jury in his county's history, to investigate several criminal matters, including the Snyder investigation. At the time of his departure from office, he felt that there was insufficient evidence to sustain a

conviction. Bernard Podcasy succeeded Gillespie and served until January, 1988. He received a unanimous Grand Jury report in August of 1986 which recommended that, while there was unequivocal evidence of incendiary origin, the evidence to support an indictment was insufficient. The panel recommended vigorous pursuit of the investigation. Other than pursuit of a fruitless anonymous tip and being immersed in current business, there was no especial proactivity on the Snyder matter during the remainder of his term. Correale Stevens served from January, 1988 to July, 1991. He was briefed on the case and had some key staff members review the matter, but determined thereafter that there was not enough to warrant an arrest. His overall view as to older unsolved cases was that they were primarily police matters. (The investigations were being pursued by the Wright Township Police and the Pennsylvania State Police).

¶ 9 Jerome Cohen served as District Attorney for five months and took no action. He, as did Stevens, stated that any inactivity was not for the purpose of achieving tactical advantage. Robert Martz was a regional chief for the Pennsylvania State Police. He reviewed the investigation file on six to eight occasions and consulted with his commander as well as District Attorney Stevens. Martz considered it an open investigation. Joseph A. Jacob, the Chief of Police of Wright Township, advised that he reviewed the evidence two times a year and did not repetitively re-interview the witnesses since to do so is often counterproductive; he had conferences with experts and other law enforcement persons on numerous occasions, maintained periodic contact on the case with the State Police, and maintained observation of the suspect. When, as a result of District Attorney Olszewski's reappraisal of the case, renewed interviews were conducted he found that certain witnesses who had had an allegiance to the suspect were more forthcoming when a common employer closed its operation and they were no longer co-employees of appellant. The key to the eventual institution of criminal proceedings came after Peter Paul Olszewski, Jr., took office as District Attorney in 1992. Renewed action was occasioned by an approach from one of his county detectives, Jack Hlivia, who had been a state trooper and was familiar with the case. After conversation with Hlivia, he commissioned him to gather the investigative files from the agencies involved. After some time, Olszewski reviewed these files as well as the Grand Jury testimony. This led to interviews and discussions with a number of knowledgeable resources. Based on all of this, he was "absolutely not" of the judgment that Snyder should then be arrested. Nevertheless, he convened a meeting on April 5, 1993 with state and township law enforcement authorities and members of his own staff to address a number of questions and consider undertaking a rekindled investigation. The investigating team represented the three agencies. This involved relocating and re-interviewing witnesses; reviewing physical evidence and collecting it, as well as providing a chain of custody log. Consultations were had with FBI experts and insurance investigation records from the fire loss. There was consultation with federal Alcohol, Tobacco, and Firearms representatives and a forensic pathologist. There was an investigation into the theologic aspects of suicide which was the anticipated defense. As a result of information gathered, appellant was arrested. The new information, which led to the prosecutor's decision to arrest Snyder, included; information from a witness who gave a lead to evidence from three other witnesses which clearly contradicted any suggestion that the wife victim was contemplating suicide. There was also elicited a crucial admission of a sexual relationship between a witness and appellant. This led to a new corroborating witness who confirmed this relationship and the existence of documentary support. Other evidence was developed to support a theory that the appellant likely aspired to end

his marriage and continue the relationship. All of this served for the first time to provide a motive which, although not a necessary ingredient of the crime, was certainly crucial to a successful prosecution. The investigation also unveiled other evidence that appellant had engaged in several other, more casual, sexual relationships. Significantly, the interviews with the person who had developed a romantic relationship with Snyder uncovered the fact that he had furnished her with two recordings with titles suggesting dissatisfaction with his marital partner and a preference for his paramour. New evidence was gathered to support an argument that the wife decedent was not in a state of mental depression but, rather, that she was looking forward to future events; that appellant had expressed disdain for his infant child; and that the alcohol in the wife victim's blood at midday was completely out of character for her. Supporting testimony was received with respect to the observation of a witness that on the morning of the fire, appellant was seen to exit his residence exhibiting a limp in his walk. A witness who became a trial witness furnished her opinion that when appellant came to a bank (after the fire was initiated) he appeared nervous and fidgety and in a hurry. Two witnesses were interviewed and testified at trial who supported a theory that a smoke detector had been rendered inoperative.

¶ 10 In sum, the reinvigorated Olszewski investigation interviewed some 80 persons on various expected issues who had not been previously sought out. The District Attorney ended his testimony by stating that he would not have proceeded to prosecute without this new information, having previously determined that an arrest was not appropriate. The initiative of District Attorney Olszewski that the Snyder case was ripe for a very substantial commitment of public resources to a renewed investigation which ultimately bore fruit, does not depreciate the integrity of his predecessors' election as to the proper urgencies during their occupancy of the office.

¶ 11 From our review of the precedents, many of which involve homicides for which there is no statute of limitations, it is clear that in assessing the performance of prosecutors as to delay in initiating charges, there is a distinct characteristic of hesitancy to critically evaluate the day-to-day decision making of the office of the prosecutor.[2] This, undoubtedly, stems from a recognition that the prosecutor must face a stream of current cases which demand immediate attention and are subject to intense public scrutiny; that the office typically has limited resources which must react to legislative, judicial, media and public demands for priority in addressing an ever-changing array of social problems. However, the courts will not tolerate any purposeful shelving of a case to gain advantage. While it may not be expected that an older unsolved case may always receive the highest priority among competing demands, the prosecutor who exhibits studied recognition of his ongoing responsibilities to his constituency, should not be censured for a good faith election in the performance of his duty.

¶ 12 It should not offend constitutional standards even if it may be said that a given case has undergone a period of informed deferral or perhaps even benign neglect. So understood, we find that the hearing court did not abuse its discretion in finding that the reasons for the delay were valid and the delay was proper.

2. Our courts have long recognized that the content and timing of charging decisions rests with the District Attorney. See *Hearn v. Myers*, 699 A.2d 1265 (Pa.Super.1997); *Commonwealth v. Mulholland*, 549 Pa. 634, 702 A.2d 1027 (1997); *Commonwealth v. Slick*, 432 Pa.Super. 563, 639 A.2d 482 (1994), appeal denied, 538 Pa. 669, 649 A.2d 671 (1994); *Commonwealth v. Spells*, 417 Pa.Super. 233, 612 A.2d 458 (1992), appeal denied, 537 Pa. 350, 643 A.2d 1078 (1994); *Commonwealth v. McElroy*, 445 Pa.Super. 336, 665 A.2d 813 (1995), appeal denied, 544 Pa. 610, 674 A.2d 1073 (1996).

¶ 13 The evidence demonstrates that each prosecuting officer and law enforcement officer, who successively had responsibility for the Snyder case, gave consideration to the investigation and made even-handed decisions as to the status of the case. It was not until the administration of District Attorney Olszewski that, inspired by the prompting of a veteran law enforcement officer, it was decided to devote substantial resources to reinvestigate the crime which uncovered substantial new evidence which changed a long standing assessment of sufficient to arrest, to the more responsible standard of sufficient to convict.

### Commonwealth v. Scher

¶ 14 During the progress of this case on June 7, 1999, a panel of this court decided the matter of *Commonwealth v. Scher*, 732 A.2d 1278 (Pa.Super.1999). While *Scher* is factually dissimilar, it does directly involve the prosecutorial delay concept which is presently at issue. Our court adopted a standard based upon a decision by Senior Judge Barnes of the Ninth Circuit in *U.S. v. Mays*, 549 F.2d 670 (9th Cir.1977). We enunciated the following standard:

> Therefore, where there has been an excessive and prejudicial pre-arrest delay, we will not only inquire as to whether there has been any intentional delay by the prosecution to gain a tactical advantage over the accused, but we will also consider whether the prosecution has been negligent by failing to pursue a reasonably diligent criminal investigation.

*Commonwealth v. Scher*, 732 A.2d at 1284.

■ ¶ 15 This standard, by its terms, implicates both a negligence and due diligence concept in the judicial evaluation of the prosecutor's performance. Indeed, the conclusion of the opinion in setting aside a homicide conviction was that the court could not find a "diligently pursued" investigation and that the Commonwealth, by inactivity, was "grossly negligent". We

are mindful that *Scher* has now been argued on appeal to our supreme court. 561 Pa. 693, 751 A.2d 189 (2000). We have considered the instant case under what we consider to be the standards called for in the *Marion/Lovasco* line of cases which have been embraced by our supreme court. The *Scher* decision was filed after the hearing and order on remand in the instant matter and we have elected not to follow the "due diligence" and negligence standards adopted therein. As a court *en banc*, we are not bound to follow a superior court panel opinion. *See Neilson v. Nationwide Insurance Co.*, 738 A.2d 490 (Pa.Super.1999); *Commonwealth v. Henderson*, 444 Pa.Super. 170, 663 A.2d 728 (1995). As an intermediate appellate court, we have chosen to go forward with our decision so as not to contribute further delay to a case where the subject incident occurred in July of 1982.

¶ 16 Order affirmed.

¶ 17 Judge POPOVICH files a Dissenting Opinion in which Judge TODD and Justice MONTEMURO have joined.

¶ 18 Judges KELLY, JOHNSON, HUDOCK, FORD ELLIOTT, EAKIN have joined the majority.

POPOVICH, J., dissenting:

¶ 1 Unlike the Majority, I am unable to find that the investigative efforts of the prosecution in this case were either proper or without "prejudice" to the appellant. Accordingly, I respectfully dissent.

¶ 2 The appellant, Keith E. Snyder, appeals the September 30, 1998, order of the Court of Common Pleas of Luzerne County finding that the reasons the Commonwealth delayed over eleven years to prosecute him for the death of his wife and infant child were valid and that, such being the case, the delay was proper and did not warrant a discharge.

¶ 3 An examination of the record discloses that on July 2, 1982, the appellant's wife and six-week-old son died of carbon

monoxide poisoning caused by a fire in their home in Wright Township. The appellant left for work approximately one hour before the fire was reported. An autopsy of Mrs. Snyder revealed barbiturates and a blood alcohol level of .046%.

¶ 4 An investigation was commenced immediately by Wright Township police, the Pennsylvania State Police and the District Attorney's Office of Luzerne County, but no arrests were made after two years. This was followed by the empaneling of a special grand jury in 1984, but it too ended in 1986 without issuing any presentments.

¶ 5 It was not until 1993 that a newly elected District Attorney reopened the case and filed a criminal complaint on September 8, 1993. Pre-trial motions were filed claiming the passage of more than eleven years violated the appellant's due process rights under the Constitutions of the United States and Pennsylvania, which rendered exculpatory evidence unavailable and prejudiced the defense (suicide) via witnesses who had died or their memories faded. The trial court held the appellant was not prejudiced.

¶ 6 Following trial, a jury convicted the appellant of arson and two counts of first-degree murder. The trial court sentenced the appellant to two consecutive terms of life imprisonment, with a concurrent five-year term for the arson conviction. This Court affirmed the judgment of sentence (No. 0934 Philadelphia 1995). On allocatur, our Supreme Court held "the excessive lapse of time caused actual prejudice to the Appellant", which necessitated a remand for the prosecution to justify the delay. *Commonwealth v. Snyder*, 552 Pa. 44, 713 A.2d 596 (1998).

¶ 7 Two days of hearings were conducted wherein three former and present District Attorneys of Luzerne County gave testimony concerning the eleven-year, two-month time lapse between the fire and the appellant's arrest. To appreciate my view of this case, a detailed review of the evidence is imperative.

¶ 8 The initial District Attorney served from 1982 until December of 1986. During his tenure, the investigation began and included interviews of some seventy witnesses, all of which generated reports.

¶ 9 The District Attorney testified that the Wright Township Police Department was leading the investigation, joined by the Pennsylvania State Police and his office. Over the next several years, the District Attorney's personnel conferenced constantly with investigators in an effort to secure sufficient evidence to arrest the perpetrator of the arson deaths. Input came from a variety of sources, e.g., Dr. Hudock's autopsy concluded the deaths were the result of criminal homicide. Other contributions came from a private drug lab (Eli Lilly & Co.), the Fire Commissioner of Philadelphia, the FBI crime lab in Georgia, the National Medical Services Lab and the Pennsylvania State Police Crime Lab.

¶ 10 As far as the District Attorney was concerned, two issues needed to be resolved before an arrest could occur. One, the time lapse between the appellant leaving his home and the fire being detected was sufficient to justify restraint in issuing an arrest. Despite consulting "everybody" to establish the "burn time," the District Attorney was "frustrated" in his efforts to obtain answers he believed would be acceptable to a jury.

¶ 11 Two, the drug (Tuinal) detected in the decedent's bloodstream needed to be linked to the appellant. Efforts to accomplish this consisted of police interviews of the appellant's former wife and former girlfriends. Also, any of his friends who had access to Tuinal were screened through the Drug Enforcement Agency without success.

¶ 12 When conventional investigative tools proved fruitless, the District Attorney empaneled a grand jury in September of 1984 to inquire into the Snyder matter as well as four other cases. Before he left office in December of 1985, ten to eleven

witnesses were subpoenaed before the grand jury, which sat from time to time as the District Attorney received sufficient evidence to submit on either the Snyder case or the others under review.

¶ 13 After all witnesses were called, the District Attorney concluded there was "insufficient evidence to sustain a conviction or to ensure the conviction of the defendant." He stated he did not fail to arrest the appellant to gain a tactical advantage.

¶ 14 The next District Attorney had a term from January of 1986 through January of 1988, a period during which the grand jury had all evidence save for hearing from the appellant's parents. This occurred in August of 1986 and resulted in the issuance of a "Report and Recommendation" that the fire was intentionally set. However, the grand jury held the evidence was legally insufficient to indict the appellant at that time. Nonetheless, it recommended that law enforcement officials "continue to vigorously pursue this investigation."

¶ 15 In light of the grand jury's refusal to indict, the District Attorney "made the decision that th[e evidence] was insufficient to approve or recommend an arrest of Mr. Snyder." Likewise, in the District Attorney's opinion there was insufficient evidence to sustain a conviction. The District Attorney's remaining term was consumed with prosecuting other cases, which meant he had a "very busy" schedule that excluded pursuing the appellant.

¶ 16 The successor District Attorney served from January of 1988 until July of 1991. At the start of his watch, he was briefed on the case by the county detective involved in the original investigation, he reviewed the file with his chief detective and other staff members before concluding that "there was insufficient evidence" to arrest or convict the appellant.

¶ 17 A policy existed during this District Attorney's tenure regarding older, unsolved murder cases: "The policy was if it was basically a police matter, [his office] would be available when the time came to make a decision whether or not to make an arrest. And then once an arrest was approved under the law, then the District Attorney's office would vigorously pursue it." Thus, except for a report in June of 1990 from the Pennsylvania State Police disclosing the appellant's remarriage, *no documents were generated by any of the governmental agencies during the remainder of this District Attorney's term germane to the appellant's case.*

¶ 18 Further, the District Attorney's office made no demand upon the state and local police departments to take additional action in the Snyder case, and the reason given was that "[i]t would not be the normal policy". Interestingly, the District Attorney conceded contacting the Attorney General of Pennsylvania for assistance (because of a lack of resources) on one other murder case (Wolsieffer), but he refrained from doing so in Snyder since "[t]hey were in different postures at the time". Moreover, despite Trooper Martz's report in May of 1988 "that this [Snyder] crime was solvable", the District Attorney declined to prosecute. His rationale: a case may be "solvable" but that does not translate into it being "prosecutorial". Further, the District Attorney testified that:

... nothing was new from the previous District Attorney ..., and he still had Detective Matt Parrell as a liaison with the police in this matter. And he ethically and morally could not authorize an arrest if in [his] discretion as District Attorney [he] didn't feel there was evidence.

¶ 19 The fourth District Attorney in this line of succession served from August of 1991 to January of 1992, but he had no knowledge of nor was he directly involved with the Snyder case. His lack of activity in the case was not motivated by a desire to have the Commonwealth gain a tactical advantage.

¶ 20 The last of the District Attorneys to testify was the then current office-holder. His appointment came on January 5, 1992,

and he met with county detective Jack Hlivia to discuss the Snyder case. The outgrowth of the meeting was Hlivia's assignment to obtain files from the Pennsylvania State Police, the Wright Township police department and his own office. This process took approximately six months before the District Attorney could digest the reports and the grand jury transcripts.

¶ 21 Moreover, the District Attorney had a series of meetings with a variety of officials (Hlivia, Pennsylvania State Police's retired fire marshall, the retired member of the Pennsylvania State Police R & I unit and the Wright Township police chief) to discuss their roles in the case. Thereafter, he was of the opinion that it was inappropriate to effectuate an arrest of the appellant. He also testified that he was unaware of the source of the Pennsylvania Supreme Court's statement in the *Snyder* opinion that the arrest of the appellant occurred "because the policies of the Luzerne County District Attorney's office changed when a newly-elected district attorney took office."

¶ 22 The District Attorney also took issue with the Supreme Court's comments that no additional investigation or evidence surfaced after the grand jury convened in 1986. Specifically, he gave a chronology of events since he took office to counter the remark by the high Court of a lack of investigative activity in the case; to-wit:

1) April 5, 1993—First formal meeting convened at the Pennsylvania State Police barracks in Hazleton. Present were Wright Township police and members of the District Attorney's office to hear the District Attorney's view and discuss the feasibility of developing a full-time team to do additional investigation.

   a) An investigative team was appointed to review and familiarize itself with the evidence to date;

   b) Reinterviewing and locating witnesses was to occur, which was described by the District Attorney as a "mammoth" project;

   c) Leads were to be followed and individuals were to be interviewed who had yet to be questioned;

   d) All physical evidence gathered by the different agencies was to be placed in a central depository and "chains of custody" were to be created so as to render all evidence admissible in court; and

   e) All photographs were to be collected, identified and placed in order.

¶ 23 In May of 1993, the District Attorney met with the FBI's Behavioral Science Unit in Quantico, Virginia. Additionally, the files of Nationwide (the insurance carrier) were reviewed, the medical record of each decedent was examined, meetings were conducted to locate fire experts on the "cause and origin" of the conflagration, and the burn time and burn pattern had to be evaluated. Toward that end, two fire experts were hired.

¶ 24 A forensic pathologist (Dr. Michael Baden) was retained to resolve significant toxicology issues concerning the autopsy. A criminologist hired in 1982 to test for solvents in the Snyder's carpet was interviewed several times. He indicated an oil and gas residue in the nap of the rug was consistent with a mixture found in the Snyder's residence.

¶ 25 Discussions were had with Dr. Baden concerning the drug Tuinal, which was found in Mrs. Snyder and the amount of time it would take to affect the victim. Investigators also spent a significant amount of energy locating the source of the drug.

¶ 26 Efforts to bring closure to the case did not end until the District Attorney: 1) met with a theology expert to examine all the ramifications to a Christian (as Mrs. Snyder was) who committed suicide; 2) reviewed a cult movie seen by the victim before her death; and 3) consulted a jury selection expert.

¶ 27 Even after the appellant's arrest, the investigation continued. The new, additional and different evidence obtained subsequent to 1993 consisted of the following:

1) Janice Braskey provided information "critical" to the District Attorney's office allowing follow-up interviews of Stephanie Kluck, Carol Maughan and Patricia Brown;

2) Stephanie Kluck told investigators that Mrs. Snyder came to her shop on July 1st (the day before her death) and related the christening of young Brian to occur on Saturday, July 3rd; Mrs. Snyder ordered Tupperware from Ms. Kluck and indicated she would pay her in the future, all of which undermined a defense of suicide; at a second interview on June 15th, Kluck admitted that she had a "significant" sexual affair with the appellant during his marriage; a third interview of Ms. Kluck on July 20th related the cessation of her relationship with the appellant, which established a "motive" for the killings in the District Attorney's mind;

3) Sandy Miller was interviewed at Ms. Kluck's urging because Miller read a letter written by the appellant admitting his affection for Ms. Kluck;

4) Carol Maughan was supervised by the appellant and admitted having an affair ("making out") with him on the job;

5) Elizabeth Warman–Wark disclosed for the first time she engaged in sex with her supervisor/appellant while at work;

6) Grace Winters was also supervised by the appellant and engaged in sexual conduct at work and in the appellant's home during his marriage;

7) Elizabeth Skuba was Ms. Kluck's neighbor and corroborated information provided by Ms. Kluck and not known until 1993;

8) Dolores Margistish was a nurse for the doctor treating Mrs. Snyder and her son on June 15th, and the appointment book revealed the two had scheduled July 15th to return for a visit; Mrs. Snyder did not appear depressed. Rather, Mrs. Snyder was "happy" and "thrilled" about her baby;

9) Mary Ann Peeler was the secretary for the church where the baptism was to occur on July 3rd, and Mrs. Snyder phoned on July 1st "to confirm ... the scheduled baptism of young Brian". Ms. Peeler described Mrs. Snyder as in "good spirits", "happy", and "very perky" the day before the fire;

10) Julia Koziel was a friend of Mrs. Snyder who heard the appellant say "he was going to throw darts at his own young infant child". Ms. Koziel observed her friend being "happy", "thrilled" and "proud" of the baby, and she was not depressed nor did she drink;

11) Steven Majetski confirmed that Mrs. Snyder did not drink alcohol;

12) Jean Hudock was a friend of Mrs. Snyder and saw her with the baby and she was "proud" of the child;

13) Gladys Moran was employed at the appellant's store and witnessed, as did Ms. Hudock, mother and child in the thirty-day period before the fire exhibit signs of being "very happy, thrilled with the child";

14) Ann Marie Banks saw Mrs. Snyder on July 1st and recounted how elated she was to be able to purchase jeans given the Snyders' financial hardship;

15) Robert Corradini played softball with the appellant on the evening of July 1st and did not notice him limp or sustain an injury that would cause him to limp. Mr. Corradini gave authorities a neighbor's name (Joe Thomas) who described the appellant having a limp when he left

the house shortly before the fire was discovered;

16) Kelly Lucas–Carr was a bank teller where appellant did business on July 2nd and described him as "fidgety, nervous, and in a hurry while standing in the line at the bank.";

17) Ed Goodford was a neighbor who shut off the gas meter during the fire, corroborated and confirmed other information which was helpful in reconstructing the blaze;

18) Wright Township fire chief Gary Smith was first on the scene and corroborated other fire fighters' accounts that the windows were locked and closed;

19) Bill Spudia provided new information about the mattress on which the bodies were found as to the varying degrees of how the mattress could burn and the effect of the fire on the mattress;

20) Bill Ward was an employee of Westland Oil Company, the manufacturer of the one-gallon can in which the gas and oil mixture was found and linked to the carpeting in the home;

21) Edward St. Hart installed the smoke detector in the Snyder residence and at no time thereafter was he notified it malfunctioned;

22) Stanley Brenner was the inventor of the smoke detector and he testified that it could be de-activated without cutting wires, which was consistent with the charred detector being found with the switch in the "purged" position rendering it inoperable; and

23) Arthur Barnes was the prospective godfather. He saw Mrs. Snyder riding a stationary bike to lose weight.

¶ 28 The District Attorney testified that, excluding experts, over eighty witnesses were questioned as a result of the renewed investigation in 1993, but not all interviewees were called to testify at trial.

¶ 29 Prior to the renewed investigation, the District Attorney refused to arrest the appellant. Only after embarking on a collation and re-examination of the evidence and witnesses was an arrest and indictment of the appellant deemed warranted. The trial court agreed and held that the reasons offered for the delay were valid.

¶ 30 Our Supreme Court remanded this case after concluding that the Commonwealth's failure to file charges sooner prejudiced the appellant. In particular, the Court wrote:

The Commonwealth's case against the Appellant was based on circumstantial evidence and the inferences arising from them, and they established that Mrs. Snyder had barbiturates in her system and that someone had ignited a trail of gasoline and oil throughout the house. The Commonwealth's theory was that the Appellant drugged his wife, started the fire, left the house between 12:15 and 12:20 p.m. and the fire smoldered for approximately one hour before the children discovered it.

At trial, the Commonwealth also sought to counter the Appellant's defense that Mrs. Snyder was depressed and committed suicide by taking barbiturates and setting fire to the house killing herself and her son. To establish Mrs. Snyder's state of mind, the Commonwealth introduced extensive evidence including the testimony of twelve lay witnesses who testified that they had contacts with her shortly before death and she appeared happy after the birth of the child.

After the Commonwealth raised the issue of Mrs. Snyder's state of mind in its case-in-chief, the defense attempted to rebut the evidence with contrary evidence showing she was depressed before death. The Appellant testified on his own behalf and introduced the testimony of three other witnesses who had contact with Mrs. Snyder before she died. Forensic pathologist Cyril Wecht, M.D., also testified as a defense witness, and

opined that his review of all the available evidence led him to conclude that Mrs. Snyder committed suicide. The Appellant's toxicologist testified that the barbiturates in Mrs. Snyder's system could not have been given to her secretly in food or a drink because they had a bad taste.

In addition to the witnesses who became unavailable because of the passing of time[—e.g., Dr. Berger, a psychiatrist experienced in performing psychiatric autopsies to assess the decedent's mental state hampered because passage of time resulted in loss of close friends and family members who knew the decedent; Monsignor Nolan, before he died, interacted with Mrs. Snyder because of the upcoming baptism. He commented after seeing the bodies in the home that Mrs. Snyder committed suicide; the appellant's father was told while alive by the victim's co-workers that she said "goodbye" the day before the fire; and the victim's father was told by a family friend (Amy Kochanski) his daughter should not have seen a movie involving the suicide of the characters (mother and child) by fire], the record is replete with instances where prosecution and defense witnesses ... changed their testimony or could not remember specific details when they testified at trial.

\* \* \* \*

Because of the developments in the case at trial, the Commonwealth introducing considerable evidence concerning Mrs. Snyder's state of mind, and the unavailability of key witnesses close to Mrs. Snyder, we conclude that the Commonwealth's failure to file these charges sooner resulted in actual prejudice to the Appellant in presenting his defense at trial.

713 A.2d at 602–603 (Footnote omitted).

¶ 31 Even though the first prong of the *Marion/Lovasco*[3] criteria (to determine

whether pre-indictment delay results in actual prejudice to a defendant) was satisfied, the Supreme Court found it necessary to remand to address the second prong, i.e., were there *valid* reasons for delaying prosecution? In the absence of satisfying both prongs, a discharge is not warranted. *Id.*

¶ 32 Initially, I find no support in the record to conclude that any District Attorney of Luzerne County, either prior or present, intentionally postponed prosecution to gain a tactical advantage over the appellant. On the other hand, I, in contrast to the Majority, am unable to discern from the record any *valid* reason why this case lay dormant from 1986 until 1992 before being resurrected by an administration implementing measures (collating existing data, re-interviewing witnesses for new information and leads, and hiring experts) that were just as extant in 1986 thru 1992 as they were post–1992. If this fervor existed in January of 1992 to reactivate the case, the record is devoid of any reason (either financially or manpower) why this same incentive should not have fueled the "ongoing" tact, as recommended by the grand jury in 1986 of "vigorously" pursuing the case, before 1992.

¶ 33 Query: Why did those in a position of authority wait six years to amass this armada of men and resources? No one was asked nor answered this question, and I would not remand for a second time to have it resolved. See Zappala, J.'s Concurring and Dissenting Opinion in which Flaherty and Cappy, JJ. joined in *Snyder, supra* (Chastising the Majority for remanding because the Commonwealth had the opportunity to give reasons for delaying in prosecuting the appellant and did not seize the moment at the pre-trial hearing scheduled for just that purpose).

¶ 34 In this light, given the mandate of the Supreme Court to glean whether *valid* reasons existed for the inordinate delay, I

---

**3.** *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) and *United* *States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

conclude that no *valid/investigatory* reason was given to justify the hiatus in prosecuting this case. When you couple this fact with the Supreme Court's initial finding that the appellant was actually prejudiced by the delay (with the loss of witnesses and memories waning), the course to pursue is well-lit and should result in vacating the judgment of sentence. *Snyder, supra; Commonwealth v. Scher*, 732 A.2d 1278 (Pa.Super.1999).

¶ 35 The Majority takes the view the prosecution followed the discovery of substantial new evidence and that the delay was not motivated by the securement of an unfair advantage that prejudiced the appellant. Therefore, the delay is to be sanctioned. I do not subscribe to that position. In fact, quite the contrary is true in regard to the prejudicial ramifications flowing from the Commonwealth's delay in prosecution of this case. For example, it is to be recalled that our Supreme Court has already concluded that the appellant, in fact, was "prejudiced" by the Commonwealth's inordinate delay in investigating the two deaths. *Snyder, supra.*

¶ 36 All that is left for this Court to assess are the reasons for the delay to ascertain if they were *valid* in origin and purpose. From my assiduous review of the voluminous record, I find that the reasons proffered were neither *valid* (to forestall Due Process violations) nor devoid of *prejudice* (as the aftermath of inactivity resulted in the *defendant's witnesses dying and their memories waning* ) and, certainly, do not merit the imprimatur of this Court as proper prosecutorial behavior.

¶ 37 Accordingly, I respectfully dissent.